E-FILED
Thursday, 11 April, 2019 02:40:18 PM
Clerk, U.S. District Court, ILCD

1          UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF ILLINOIS
2                  URBANA DIVISION

3
UNITED STATES OF AMERICA,   ) Docket No. 18-cr-20044
4                           )
        Plaintiff,           )
5  vs.                       )
                            )  March 19, 2019
6  DAVID LEWIS,              )
                            )
7        Defendant.          )
   _____)
8

9               RECORD OF PROCEEDINGS
                  MOTION TO SUPPRESS
10       BEFORE THE HONORABLE SARA DARROW
             UNITED STATES DISTRICT JUDGE
11

12                THE APPEARANCES

13             BRYAN DAVID FRERES, ESQ.
               Assistant U.S. Attorney
14                201 South Vine
                 Urbana, IL  61802
15          On behalf of the Plaintiff

16

17           ELISABETH R. POLLOCK, ESQ.
          Assistant Federal Public Defender
18             300 W. Main Street
                Urbana, IL  61801
19         On behalf of the Defendant

20

21

22           Nancy Mersot, CSR, RPR
        United States District Court Reporter
23           100 N.E. Monroe Street
               Peoria, IL  61602
24
Proceedings recorded by mechanical stenography,
25  transcript produced by computer-aided transcription.

```
 1                         INDEX
 2   GOVERNMENT'S WITNESSES:                    Page
 3          MIKE BEDALOW
 4   Direct Examination                          4
 5   Cross-Examination                          20
 6   Redirect Examination                       27
 7   Recross-Examination                        30
 8          MICHAEL BOWMAN
 9   Direct Examination                         32
10   Cross-Examination                          49
11   Redirect Examination                       69
12   Further Redirect Examination (continuing)  72
13   Recross-Examination                        74
14   Further Redirect Examination               75
15          CODY BENSCHNEIDER
16   Direct Examination                         76
17   Cross-Examination                          95
18   Redirect Examination                      106
19   Further Redirect Examination              114
20   Cross-Examination                         120
21   Further Redirect Examination              121
22
23
24
25
```

3

```
1            (Proceedings were held in open court.)
2            THE COURT:  Please be seated.  Good morning,
3   everyone.
4            Sorry for this slight delay.
5            This is the case of the United States of
6   America v. David Lewis, case number 18-20044.
7            Appearing on behalf of the government is
8   AUSA Freres.
9            Appearing in open court is the defendant,
10  Mr. Lewis, along with his attorney, Miss Pollock.
11           This matter comes before me today for
12  hearing on the Motion to Suppress.
13           Mr. Freres, on behalf of the government are
14  you ready to proceed?
15           MR. FRERES:  I am, Your Honor.
16           THE COURT:  Thank you.  Miss Pollock, on
17  behalf of Mr. Lewis, are you ready to proceed?
18           MS. POLLOCK:  Yes, Your Honor.
19           THE COURT:  Have you coordinated with one
20  another to determine who will be presenting their
21  evidence first?
22           MS. POLLOCK:  Yes, we have, Your Honor.
23           The government will accept the burden of
24  production.
25           THE COURT:  Okay.  Thank you.
```

4

```
 1          Mr. Freres, you may call your first witness.
 2          MR. FRERES:  Mike Bedalow Your Honor.
 3          (Witness sworn.)
 4                    MICHAEL BEDALOW,
 5   after having been duly sworn, testified as follows:
 6                    DIRECT EXAMINATION
 7   BY MR. FRERES:
 8   Q.   Good morning.  Will you please state your name
 9   and spell your last name for our record.
10   A.   Michael Bedalow, B-e-d-a-l-o-w.
11   Q.   How are you employed?
12   A.   I am employed with the Justice Police
13   Department.
14   Q.   Where is the Justice Police Department?
15   A.   Justice is a small suburb just outside of
16   Chicago.
17   Q.   How long have you been with Justice PD?
18   A.   I have been employed there for 17 years.
19   Q.   What's your current title?
20   A.   I'm a sergeant with the Justice Police
21   Department.
22   Q.   And are you assigned to any task forces?
23   A.   I am currently assigned as a task force officer
24   with the Drug Enforcement Administration.
25   Q.   What field division are you associated with?
```

1  A.   The Chicago field division.

2  Q.   Have you ever worked with any other field

3  divisions out of DEA?

4  A.   No.

5  Q.   Now, do you primarily work cases involved in the

6  Chicago area?

7  A.   Primarily, yes.

8  Q.   Does your law enforcement job take you to

9  Central Illinois much?

10  A.   Not often, but we travel.

11  Q.   You travel to follow wherever your

12  investigations lead?

13  A.   Exactly.

14  Q.   I'm going to direct your attention to

15  February 8th of 2017.

16        Were you with the DEA task force at that

17  time?

18  A.   I was.

19  Q.   Was that the Chicago division task force?

20  A.   Yes.

21  Q.   Were you investigating an individual -- a drug

22  trafficker who you suspected of being involved in

23  trafficking who was operating out of Chicago at the

24  time?

25  A.   I was.

Q.   And as part of your investigation of that
individual, did you come to the Central District of
Illinois on that day?
A.   I did.
Q.   And did your investigation eventually lead you
to 1219 Sherman in Danville?
A.   It did.
Q.   Can you kind of just describe the general
parameters, the background of the investigation, who
led you to 1219 Sherman that day?
A.   We were focusing on a subject based out of
Chicago that was a multi-kilo distributor of
cocaine.  On that day, we followed him to Danville,
Illinois at the Sherman address, and we seen him
going into the residence and exit the residence.
Q.   This was all on February 8th?
A.   Correct.
Q.   Prior to this point, had your investigation into
this individual led to Danville in the past in any
way, shape, or form?
A.   It did.
Q.   Explain that for us.
A.   We had a court-ordered GPS tracker on his
vehicle, and we observed the tracker several times
in the Danville area.

1  Q.   Now let's turn back to February 8 of 2017; that
2  day did you work with any local law enforcement in
3  Danville area that day?
4  A.   We did.
5  Q.   When law enforcement operates in a new area,
6  what steps do you usually take to aid your
7  investigation?
8  A.   Typically when we go to a new area outside of
9  our usual parameters, we make contact with a local
10  narcotics team or another DEA office, if there was
11  one available.
12  Q.   What's the purpose of doing that?
13  A.   They have more knowledge of the area, they can
14  assist with surveillance, or, you know, a search.
15  You know, it is their area and they have more
16  knowledge than we would.
17  Q.   Is it also a way to de-conflict, to make sure
18  that law enforcement is not working for cross
19  purposes?
20  A.   Correct.
21  Q.   Did you contact anyone -- did you or someone
22  associated with the investigation contact anyone in
23  Danville law enforcement that day?
24  A.   We did.
25  Q.   Specifically the Vermillion County Metropolitan

1  Enforcement Group?

2  A.   That's correct.

3  Q.   Did agents from VMEG assist you that day?

4  A.   They did.

5  Q.   What were their primary roles?

6  A.   They assisted us when we made contact at the

7  residence on Sherman, and they assisted in searching

8  and securing the residence there.

9  Q.   And specifically the two VMEG agents provided

10  security while the DEA agents were searching the

11  1219 Sherman residence?

12  A.   They did.

13  Q.   Let's talk about that search.  You mentioned

14  that this -- your investigation, you said it was a

15  multi-kilo dealer went to this residence; is that

16  correct?

17  A.   Correct.

18  Q.   What did you do, "you" being "you and the other

19  DEA agents," after this happened?

20  A.   After the main subject of our investigation

21  left, we conducted a knock-and-talk consent at the

22  1219 Sherman.

23  Q.   When you say a "knock-and-talk," what do you

24  mean by that?

25  A.   We knock on the door, make contact with the

1  resident, attempt to gain their cooperation and

2  further our investigation.

3  Q.   Did you have a search warrant for 1219 Sherman

4  that day?

5  A.   No.

6  Q.   And so your plan was to go up and make contact

7  with the individual and hope they cooperate with

8  you?

9  A.   Correct.

10  Q.   Approximately what time did you walk up to the

11  front door at 1219 Sherman?

12  A.   It was approximately 2:00 p.m.

13  Q.   Did you permanently knock on the door?

14  A.   I did.

15  Q.   And what, if anything, happened at that point?

16  A.   The homeowner answered the door, and I made

17  contact with him.

18  Q.   Were you able to identify that individual?

19  A.   I did.

20  Q.   What was his name?

21  A.   Terrance Liggins.

22  Q.   And when you knocked on the door at this time,

23  was there a large police presence around the house?

24  A.   When we first arrived there, there were seven of

25  us there, and, you know, I think there were three,

1  three or four at the front door, and then maybe, you

2  know, the other three on the sidewalk or near the

3  residence.

4  Q.   Were there a bunch of police cars scattered

5  around?

6  A.   We drove -- we drive unmarked vehicles,

7  surveillance vehicles, so there were -- at that time

8  there were no marked units there.

9  Q.   And after you identified Mr. Liggins, what, if

10  anything, did you tell him about why you were there?

11  A.   I told him I was an investigator with the Drug

12  Enforcement Administration, and I was looking to

13  gain his cooperation in our investigation.  I let

14  him know that his residence was under surveillance

15  based on what we saw prior in the day, and he agreed

16  to cooperate.

17  Q.   Did you ask anything of him at that time?

18  A.   I asked him for consent to search his residence.

19       MR. FRERES:  Your Honor, may I approach?

20       THE COURT:  You may.

21  BY MR. FRERES:

22  Q.   I'm going to hand you what has been marked as

23  Government's Exhibit 1?

24       Do you recognize that form?

25  A.   It is a consent to search form.

1  Q.   And is there anybody -- any signatures on there?

2  A.   My signature is on here and Terrance Liggins.

3  Q.   Is that the consent to search form that you

4  presented Mr. Liggins that day?

5  A.   It is.

6  Q.   Did everybody agree -- sign it and agree and was

7  that your basis for the search of the residence?

8       MR. FRERES:  Your Honor, I move to admit

9  Government's Exhibit 1.

10       MS. POLLOCK:  No objection.

11       THE COURT:  I'm sorry.

12       MS. POLLOCK:  No objection.

13       THE COURT:  It's admitted.

14  BY MR. FRERES:

15  Q.   Would this have been signed pretty close to that

16  2:00 p.m. time or right around thereabouts when you

17  would have knocked on the door?

18  A.   Correct.

19  Q.   Now after you got Mr. Liggins' consent to

20  search, what happened from there?

21  A.   He cooperated.  He told me that a subject

22  earlier in the day came to his residence with a

23  kilogram of cocaine and they brought it down to the

24  basement.

25  Q.   What happened then?

1  A.   He led me into the basement and showed me where
2  they put the cocaine.
3  Q.   Did you seize the cocaine?
4  A.   We did.
5  Q.   And it was in fact cocaine?
6  A.   It was.
7  Q.   Did you advise Mr. Liggins of his Miranda rights
8  on scene there?
9  A.   I did.
10  Q.   Did you also advise him later during another
11  formal interview as well?
12  A.   I did.
13  Q.   And at the time you found the cocaine, how far
14  into your encounter was it at 1219 Sherman?
15  A.   It was within the first ten minutes or so.  It
16  was quick.  He cooperated right away and led me to
17  the basement.
18  Q.   At the time you arrived, were there -- were the
19  VMEG agents on scene providing security yet?
20  A.   At the time I arrived, I didn't see them due to
21  the fact that I entered the residence with Terrance
22  but they arrived shortly after.
23  Q.   So the search began roughly just before they
24  would have arrived on scene?
25  A.   Right.

1  Q.  Now did you just stop the search at the time you
2  found the cocaine or did the agents continue to
3  search the entire residence?
4  A.  Agents searched the entire residence.
5  Q.  And is that a thorough process?
6  A.  It can be, yes.
7  Q.  Did you stay with Mr. Liggins during that time?
8  A.  I did.
9  Q.  Did the other DEA agents find anything else
10 during the course of that search?
11 A.  In the upstairs bedroom they located a fully
12 loaded Glock handgun.
13 Q.  Was there anything else inside the house at the
14 time you entered the residence?
15 A.  There were -- there were a couple adults and a
16 couple small children.
17 Q.  Was one of the adults an individual named
18 Timothy Liggins?
19 A.  Correct.
20 Q.  Did somebody run warrant checks on him?
21 A.  We did.
22 Q.  Did he have any pending warrants?
23 A.  He had an active warrant.
24 Q.  Once you found -- once Mr. Liggins led you to
25 the cocaine, would he have been under arrest as

1  well?

2  A.   Correct.

3  Q.   Now while the search was going on, at some point

4  did two VMEG agents provide security for DEA?

5  A.   Correct.

6  Q.   What was your understanding of how they were

7  provided security?

8  A.   They were maintaining a perimeter on the

9  residence while we searched the -- searched the

10  residence.

11  Q.   What's the purpose of maintaining a perimeter

12  during a search?

13  A.   We don't know the intentions of people coming

14  and going from the residence.  It's to ensure our

15  safety and the people's inside safety.

16  Q.   At the time -- the entire time the search was

17  going on, was Mr. Liggins still inside?

18  A.   He was.

19  Q.   Were the children inside the residence as well?

20  A.   They were.

21  Q.   Did DEA take steps to, during the search, ensure

22  that they didn't have any weapons?

23  A.   We did.

24  Q.   And ensure that they were monitored while the

25  search was going on?

1  A.   Correct.

2  Q.   Now, at some point in time did you learn about

3  an individual who arrived at the residence?

4  A.   I did.

5  Q.   When would you have learned about this

6  individual?

7  A.   When we were wrapping up our investigation

8  there, we were getting ready to exit the residence,

9  and someone had stated to me that there was a

10  subject that was -- that approached the residence

11  and had a handgun on him.

12  Q.   Did you ever deal with this individual?

13  A.   No.

14  Q.   At the time you learned this information, was

15  the search essentially finishing up?

16  A.   At the time I learned that information, yes, we

17  were wrapping things up to leave.

18  Q.   And was Mr. Liggins still on scene at the time?

19  A.   He was.

20  Q.   Shortly thereafter, did you and the other agents

21  leave the residence?

22  A.   We did.

23  Q.   And did Mr. Liggins leave at the same time as

24  you did?

25  A.   He did.

```
 1  Q.   Do you know who dealt with this individual who
 2  showed up with the firearm?
 3  A.   The VMEG agents.
 4  Q.   Now when you left with Mr. Liggins, where did
 5  you all go?
 6  A.   We went back to the Danville Police Department.
 7  Q.   Was that a lengthy ride, a short ride, how far
 8  was it?
 9  A.   It was a, you know, a short ride.
10  Q.   And once you got back to the Danville Police
11  Department, what did you do from there?
12  A.   We organized what we needed to, you know,
13  certain people were going to talk to certain
14  individuals, and then I went to interview Terrance
15  Liggins again.
16  Q.   Was that pretty quick after you arrived at the
17  public safety building in Danville?
18  A.   Yes.
19  Q.   When you interviewed Mr. Liggins again, what did
20  you do at this point?
21  A.   I read him Miranda again, and this time from a
22  form that he signed and acknowledged his rights.
23       MR. FRERES:  Your Honor, may I approach
24  again?
25       THE COURT:  You may.
```

1  BY MR. FRERES:

2  Q.   I'm handing you what is marked as Government's

3  Exhibit 2.

4        Do you recognize that?

5  A.   I do.

6  Q.   What are we looking at here?

7  A.   This is the advice of rights form that I read to

8  Terrance and he signed.

9  Q.   Is your signature on there?

10  A.   It is.

11  Q.   What's the location listed on the form?

12  A.   Danville Police Department.

13  Q.   And what's the time the form was signed?

14  A.   3:00.

15        MR. FRERES:  Your Honor, I move to admit

16  Government's Exhibit 2.

17        MS. POLLOCK:  No objection.

18        THE COURT:  It's admitted.

19  BY MR. FRERES:

20  Q.   What, if anything, did Mr. Liggins tell you

21  during that interview that he hadn't already told

22  you?

23  A.   He basically confirmed that the subject that I

24  was following from Chicago came to his residence

25  prior in the day, entered his residence with a

1  kilogram of cocaine, and they stored it in the

2  basement.

3  Q.   And he told you about the kilogram of cocaine

4  being stored there in the basement at the scene as

5  well?

6  A.   Right.

7  Q.   Now is it -- is it dangerous conducting a search

8  on a residence?

9  A.   It is.

10  Q.   What's some of the dangers you face?

11  A.   We are dealing with unknown individuals.  We

12  don't know their intentions.  We don't know what we

13  are going to find at the residence.

14  Q.   Is it any less dangerous executing a search when

15  somebody has consented to search versus to when it

16  is being done pursuant to a search warrant?

17  A.   No, not really.

18  Q.   Who could it be dangerous for?

19  A.   Obviously, it could be the police officers or

20  the residents, neighbors.

21  Q.   The occupants themselves?

22  A.   Right, the residents.

23  Q.   People that arrive on scene?

24  A.   Correct.

25  Q.   When you're conducting such searches, narcotic

1  searches, is it important to secure the scene?

2  A.   It is.

3  Q.   And what steps do you usually take to secure a

4  scene?

5  A.   We secure the perimeter to ensure that nobody is

6  coming -- coming into the residence without our

7  knowledge, secure the people inside the residence.

8  Q.   If somebody were to arrive late and just be

9  allowed into the scene, can that jeopardize your

10  search?

11  A.   It can.

12  Q.   How so?

13  A.   We want to secure the evidence that we find.  We

14  don't want any evidence leaving the residence.

15  Q.   Could the new arriving individuals embolden the

16  people that are there as well?

17  A.   Sure.

18  Q.   In your experience as a DEA task force officer,

19  do individuals frequently come and go from drug

20  houses?

21  A.   They do.

22  Q.   Why?

23  A.   In order to, you know, purchase narcotics or

24  sell narcotics, sometimes their hangout places.

25          MR. FRERES:  Your Honor, I have no further

1  questions.

2          THE COURT:  Okay.  Thank you.

3          Any cross?

4                   CROSS-EXAMINATION

5  BY MS. POLLOCK:

6  Q.  Good morning, sergeant.

7  A.  Good morning.

8  Q.  That investigation that you were pursuing that

9  morning, you actually followed the individual from

10 Chicago to Danville, correct?

11 A.  Correct.

12 Q.  And prior to arrival at 1219 Sherman Street, you

13 never heard of David Lewis before?

14 A.  No.

15 Q.  And you, in fact, did not investigate any part

16 of this offense with relation to David Lewis,

17 correct?

18 A.  Correct.

19 Q.  Now, the information that you had, you had been

20 investigating that for quite a while, correct?

21 A.  I don't recall how long our investigation was on

22 to that subject, but it was fair to say it was

23 several weeks.

24 Q.  Well, long enough that you had a GPS tracking

25 device on the car, correct?

```
 1  A.   Right, right.
 2  Q.   And during that time you discovered that he was
 3  dropping off kilos of cocaine for storage somewhere
 4  in Danville, Illinois, correct?
 5  A.   We didn't know that for sure during that time.
 6  We knew he was making trips to Danville.  We didn't
 7  know the purpose.
 8  Q.   Well, when you arrived at the residence, you
 9  knocked on the door at 1219 Sherman Street;
10  Mr. Liggins was very cooperative, correct?
11  A.   Correct.
12  Q.   And he -- looks like he let you in within a
13  minute of your arrival, right?
14  A.   Correct.
15  Q.   And he was calm?
16  A.   Calm.
17  Q.   And consistently cooperative throughout your
18  encounter with him?
19  A.   He was.
20  Q.   Such that you even let the children remain
21  inside of the residence?
22  A.   We secured an area in the residence and they sat
23  in the residence in the secured area with the other
24  agents.
25  Q.   But it was secured such that the children did
```

1  not -- they were not removed from the house, right?

2  A.   No.

3  Q.   Did you search Mr. Liggins?

4  A.   We did.

5  Q.   He was not armed, correct?

6  A.   No.

7  Q.   You searched Timothy Liggins?

8  A.   Yes.

9  Q.   Was he armed?

10  A.   No.

11  Q.   Was anyone in the house armed?

12  A.   Other than the handgun that we recovered, no; it

13  was not on anyone's person, no.

14  Q.   And that was in a bedroom upstairs, right?

15  A.   Correct.

16  Q.   Did -- you at no point had your weapons drawn,

17  correct?

18  A.   Correct.

19  Q.   And you would describe this encounter as totally

20  voluntary and not in any way antagonistic, right?

21  A.   Right.

22  Q.   Now you said that you ran a warrant check on

23  Timothy Liggins; is that right?

24  A.   I didn't personally.  It was another officer.

25  Q.   Was that a DEA task force officer?

1  A.   I'm not sure who, if it was a local guy or a

2  DEA.

3  Q.   Do you know what service he used, was it NCIC,

4  or LEADS, or some other local?

5  A.   I am sure they ran him through LEADS for the

6  warrant.

7  Q.   You stated that the VMEG was providing perimeter

8  security; is that right?

9  A.   Correct.

10  Q.   They were inside the residence, weren't they?

11  A.   I was in the basement interviewing Terrance, so

12  I don't know exactly where they were, inside or

13  outside of the residence.

14  Q.   At the time that you were alerted to the fact

15  that there was an individual outside of the

16  residence being questioned, you said your search was

17  basically done, right?

18  A.   At the time I learned about that, yeah, we were

19  getting ready to leave the residence.

20  Q.   All of the evidence had been secured?

21  A.   That's what we were discussing.  You know, when

22  I came up from the basement, we were discussing, you

23  know, do we have all of the evidence, and, you know,

24  gathering everything that we needed to leave.

25  Q.   All right.  At any point did you ask Terrance

```
 1   Liggins about Mr. Lewis?
 2   A.   No.
 3   Q.   Did anyone ask him about Mr. Lewis?
 4   A.   I don't know.
 5   Q.   When -- I'm going to ask you this, were there
 6   any other individuals that approached the
 7   individuals during the time that you were in the
 8   basement?
 9   A.   There was not.
10   Q.   Are you aware of any other checks being run on
11   anyone outside of Mr. Liggins?
12   A.   I was not.
13   Q.   And you aware that in terms of the time frame,
14   you said approximately 3:00 is when that Miranda
15   waiver was signed?
16   A.   Correct.
17   Q.   So it's about an hour after you arrived at the
18   house?
19   A.   Correct.
20   Q.   So everything was wrapped up and Mr. Liggins was
21   back --
22   A.   Correct.
23   Q.   -- and talking, correct?
24   A.   Correct.
25   Q.   Do you know what time Mr. Lewis was brought to
```

the Hope Safe building?

A.   I don't exactly know.

Q.   You don't know if it was before or after

Mr. Liggins?

A.   It was -- it had to be before because he was --

by the time I came up from the basement after

talking with Mr. Liggins, he was already gone.

Q.   What -- are you aware of any other DEA task

force officer that participated in the questioning

of Mr. Lewis?

A.   No.

Q.   So to your knowledge no one else was outside

other than the VMEG agents?

A.   I don't know.  There was -- there was three of

us in the basement, and there was a total of seven

DEA personnel on scene.  So that -- there would have

been four other guys upstairs.  I don't know where

they were.

Q.   Did you have any information at the time about

Mr. Liggins selling cocaine?

A.   No.

Q.   The individual from Chicago you followed,

Mr. Liggins told you he dropped it off and left it

with him, correct?

A.   Correct.

```
1   Q.   As if for storage?
2   A.   That's what he said.
3   Q.   Were they individually packaged in any way, any
4   cocaine?
5   A.   I believe they were in two separate baggies,
6   Ziploc bags.
7   Q.   In total was a kilo?
8   A.   Right.
9   Q.   That was a pretty large amount?  Is that a yes?
10  A.   I guess it depends what area you are working at.
11  Q.   Okay.  But at that time did Mr. Liggins indicate
12  that he had plans to sell that cocaine?
13  A.   He didn't say.
14       MS. POLLOCK:  Nothing further.  Thank you.
15       THE COURT:  Thank you.  Any redirect?
16       MR. FRERES:  Briefly.
17       THE COURT:  Before you begin, I just have
18  one quick question.
19       From the time that you were advised of the
20  interaction with the defendant and the time you
21  left, how much time passed?  You said that you were
22  wrapping up and doing some other things, so how many
23  minutes passed between when you were informed of
24  this interaction with the defendant and when you
25  left the premises?
```

1          THE WITNESS:  So -- how long when agents
2  were -- when Mr. Lewis was on scene?
3          THE COURT:  You don't know when he was on
4  scene, right?
5          THE WITNESS:  Right.  I came up from the
6  basement.  We were just gathering our things and
7  then we left.  So only a minute, two minutes, and
8  then by the time when I came up from the basement,
9  it was a minute or two.  We were clearing out.
10          THE COURT:  It was during that time period
11  that you were advised that they had --
12          THE WITNESS:  Right.
13          THE COURT:  Okay.
14                    REDIRECT EXAMINATION
15  BY MR. FRERES:
16  Q.  Just to follow-up on that.
17          The entire time that you were in the
18  basement, was the search still ongoing?
19  A.  It was.
20  Q.  And so at the time you came upstairs and learned
21  about the individual with the gun, would it be fair
22  to say that the search was still ongoing even at
23  that time?
24  A.  It was.
25  Q.  Up until the time you guys would have left the

1  residence?

2  A.   Correct.

3  Q.   Now, you were asked about Terrance Liggins being

4  cooperative.  There were other individuals inside

5  the house, correct?

6  A.   Correct.

7  Q.   Just because one individual is being

8  cooperative, does that necessarily mean that all of

9  them are going to be cooperative?

10  A.   No.

11  Q.   And are you concerned about the safety and the

12  risks associated with all people on scene during the

13  search?

14  A.   Absolutely.

15  Q.   Again, you mentioned that the individual with

16  the gun had already been dealt with and left by the

17  time you came upstairs to complete your search,

18  correct?

19  A.   Correct.

20  Q.   And there were four DEA agents upstairs?

21  A.   Correct.

22  Q.   You don't know where they were at or what they

23  were doing?

24  A.   No.

25  Q.   Is a kilo of cocaine a distribution amount of

1  cocaine?

2  A.   Yes.

3  Q.   I know it is different for Chicago, but what is

4  the rough street value of that amount of cocaine?

5  A.   Wholesale kilo, 35,000.

6  Q.   Significant amount of money?

7  A.   Sure.

8  Q.   If someone is storing that, if someone tells you

9  they are storing that, how would you interpret that?

10  What does that mean to you?  Would you think they

11  were going to sit there and use it gram by gram?

12  A.   No, they are keeping it for somebody to come

13  purchase it or pick it up, or, you know, maybe they

14  get directions from somebody to drop it off

15  somewhere.

16  Q.   Would that lend some concern to -- people coming

17  and going from a residence that was storing that

18  amount of cocaine?

19  A.   Yes.

20       MR. FRERES:  No further questions, Judge.

21       Thank you.

22       THE COURT:  You were just asked by

23  Mr. Freres if -- were there four DEA agents?  I

24  thought that you previously testified that there

25  were seven DEA agents and four VMEG agents.

1        THE WITNESS:  There were seven DEA
2   personnel.  Seven DEA agents, three of us were in
3   the basement talking with --
4        THE COURT:  Four were upstairs?
5        THE WITNESS:  Four were upstairs, and I
6   don't know where they were at.
7        THE COURT:  Anything based on that?
8        MS. POLLOCK:  Brief recross.
9        THE COURT:  You may.
10              RECROSS EXAMINATION
11  BY MS. POLLOCK:
12  Q.   Mr. Freres asked you about other individuals
13  inside the house and just because one of them is
14  cooperative, doesn't mean they all are.  In this
15  case everyone was cooperative, correct?
16  A.   The person I dealt with most was Terrance, and
17  like I said, we were in the basement talking.  He
18  was cooperative.  I don't know how the -- I don't
19  know what the other people upstairs, how -- what
20  their demeanor was.
21  Q.   Well, based on your investigation, did you not
22  obtain another consent to search of a different
23  residence from someone else that was in the house?
24  A.   I don't understand the question.
25  Q.   That wasn't the only house that was searched

1  that day, correct?

2  A.   To my knowledge.  That was the only house that I

3  searched that day.

4  Q.   To your knowledge, did anyone else search

5  another house based on consent that came during that

6  interview?

7  A.   Not that I'm aware of with DEA personnel, not

8  that I'm aware of.

9  Q.   All right.  In terms of the kilo of cocaine that

10  was dropped off, what was the timeframe between when

11  it was dropped off and your knock on the door?

12  A.   It was relatively quick, within the hour.

13  Q.   Is it common for someone who is dealing kilo

14  amounts of cocaine to drop off a kilo and come back

15  immediately to pick it back up?

16  A.   The person who dropped it off?  It's not common.

17  I wouldn't think that it is common.

18  Q.   Where did your subject go after he dropped off

19  the kilo?

20  A.   He started heading back north.

21  Q.   Did you stop him?

22  A.   No.

23  Q.   Did he go home?

24  A.   I don't recall where he went.

25  Q.   He was on his way back to Chicago and to your

```
 1   knowledge he actually got there, correct?
 2   A.   To my knowledge.
 3   Q.   Did you later arrest him?
 4   A.   Not that day, no.
 5   Q.   Another time?
 6   A.   Yes.
 7        MS. POLLOCK:  All right.  Nothing further.
 8        THE COURT:  Okay.  Thank you.
 9        Any redirect?
10        MR. FRERES:  No, Your Honor.
11        THE COURT:  Thank you.  You may step down.
12        The government may call its next witness.
13        MR. FRERES:  Michael Bowman.
14        Your Honor, may we excuse Officer Bedalow?
15        MS. POLLOCK:  No problem, Your Honor.
16        THE COURT:  Yes.
17        (Witness sworn.)
18        THE COURT:  Please be seated.
19               MICHAEL BOWMAN,
20   after having been duly sworn, testified as follows:
21               DIRECT EXAMINATION
22   BY MR. FRERES:
23   Q.   Morning.
24   A.   Morning.
25   Q.   Would you please state your name and spell your
```

1  last name for our record?

2  A.    Michael Bowman, B-o-w-m-a-n.

3  Q.    How are you employed?

4  A.    I am employed at VMEG, the MEG task force in

5  Vermilion County.

6  Q.    Is that a drug task force?

7  A.    Yes, sir.

8  Q.    What is your title?

9  A.    Special agent.

10 Q.    How long have you been working with VMEG?

11 A.    Three years.

12 Q.    Is that the extent of your experience in law

13 enforcement?

14 A.    Yes.

15 Q.    Did you do anything else before that?

16 A.    Negative, not.

17 Q.    What types of things do you investigate as a

18 special agent for VMEG?

19 A.    Mainly drug crimes, different things like that.

20 We respond to some forceful felonies, but our main

21 task is drug crime in Vermilion County.

22 Q.    Is that Danville?

23 A.    Yes.  Danville, Georgetown, different places.

24 Q.    Okay.  Directing your attention to February 8th

25 of 2017, were you involved in an investigation in

1  Danville that day?

2  A.   Yes.

3  Q.   Was VMEG the lead agency on this investigation?

4  A.   No.

5  Q.   Who was?

6  A.   DEA, I believe a task force out of Chicago.

7  Q.   Is it common for other agencies that may be

8  working investigation to contact local law

9  enforcement?

10  A.   Yes.

11  Q.   Why is that?

12  A.   We have a little more knowledge about the

13  geographical areas, people in the town.  We just

14  provide a little more insight on matters in that

15  town specifically.

16  Q.   Had you worked with DEA Chicago at all prior to

17  that day?

18  A.   No.

19  Q.   How did you get involved in the investigation on

20  February 8th?

21  A.   I believe I was contacted by a supervisor for a

22  VMEG.  They received a phone call from Chicago DEA.

23  They were conducting an investigation on a

24  residence, and they needed our assistance at that

25  residence.

1  Q.   Was that residence 1219 Sherman in Danville?

2  A.   Yes.

3  Q.   And was DEA planning some operation as it

4  related to that residence?

5  A.   To my knowledge, yes.

6  Q.   Did you travel to that residence that day?

7  A.   Yes.

8  Q.   Approximately what time?

9  A.   1:30, 2:00.

10  Q.   Are you certain on the time?

11  A.   Not entirely positive.

12  Q.   At the time you arrived, what was going on?

13  A.   At the time I knew DEA agents to be inside.

14  There were individuals outside.  I just knew that

15  they had evidence and people in custody at the

16  residence.

17  Q.   There was a search going on at the time you

18  arrived?

19  A.   Yes.

20  Q.   And was the DEA agent there conducting the

21  search?

22  A.   Yes.

23  Q.   Were there police cars everywhere when you

24  arrived there?

25  A.   I do not recall.  I don't recall seeing marked

1  squad cars.  I know there were vehicles.
2  Q.   You said there were people.  Were there people
3  outside the residence?
4  A.   There were people, civilians at the residence,
5  three or so people.
6  Q.   When you arrived, did you -- was anybody else
7  with you?
8  A.   Yes Agent Benschneider.
9  Q.   Cody Benschneider?
10  A.   Cody Benschneider.
11  Q.   Was he also with VMEG at the time?
12  A.   Yes.
13  Q.   He is no longer with VMEG.  He is with Tilton PD
14  now, correct?
15  A.   Yes.
16  Q.   Now at the time the two of you arrived, did you
17  make contact with the DEA agents.
18  A.   Briefly.  I couldn't recall what we said, but,
19  yes.
20  Q.   What, if anything, did you learn about what was
21  going on or what you had?
22  A.   We were informed that it was either by our
23  supervisor or by DEA that there was a kilo of
24  narcotics found inside the residence and firearms at
25  the residence.

1  Q.   And what, if anything, did they ask you and

2  Agent Benschneider to do?

3  A.   They asked us to talk to the people outside,

4  dismiss people as needed outside the residence, and

5  keep the scene secure, keep a perimeter.

6  Q.   Essentially, from the time you arrived, you were

7  aware a kilo of coke and a gun; police located a

8  gun?

9  A.   Yes.

10  Q.   At that point in time did you make contact with

11  the individuals inside?

12  A.   Yes.

13  Q.   Describe the process for us.

14  A.   We -- there was a car parked in the driveway.

15  There were two individuals.  We talked to them.  We

16  got their information.  Made sure that they had a

17  valid license, had no warrants, and as long as they

18  were not tied to the investigation we dismissed them

19  so they could leave.  There was three people total,

20  another car parked on the street.  We talked to the

21  female at that car and we talked to her, did the

22  same thing.  All three, no warrants, and were able

23  to drive away from the residence.

24  Q.   Okay.  So you were doing warrant checks and then

25  letting people go?

1  A.    Yes.

2  Q.    What was the purpose of clearing the scene like

3  this?

4  A.    Officer safety.  These people weren't tied to

5  the investigation from what we understood, and they

6  were basically just asked to leave and come -- they

7  had no ties to them.

8  Q.    Did their presence on scene present a safety

9  risk for everyone involved?

10  A.    Yes.  We were trying to keep things from

11  escalating and people getting angry or anything like

12  that, just keep people away from the scene at the

13  time.

14  Q.    Now after clearing the people surrounding the

15  house, what you did you do next?

16  A.    It was cold outside, so we stepped inside the

17  front door and left the actual wood door open and

18  kept the screen door closed.  We stood inside the

19  front door area just looking outside, keep an eye

20  outside the front door.

21  Q.    Are still maintaining the perimeter of the

22  search?

23  A.    Yes.

24  Q.    And what was your purpose as you stood there?

25  A.    Make sure nobody came in the front door.  The

1  DEA agents while they were searching, they felt safe

2  and they could search freely without worrying about

3  other people coming inside.

4  Q.   Were you visible from the outside where you were

5  standing?

6  A.   I couldn't say -- I know we were standing inside

7  the door.  If you could see through the screen, you

8  could probably see us but not visually outside, no.

9  Q.   What were you wearing at the time?

10 A.   I was wearing a police vest, outer carrier.  I

11 had police markings on it.

12 Q.   What was Agent Benschneider wearing?

13 A.   The same item I was wearing, the same vest.

14 Q.   How long -- at some point as you stood there,

15 did somebody approach the residence?

16 A.   Yes.

17 Q.   And approximately how long did you stand there

18 before this encounter happened?

19 A.   No more than five minutes.

20 Q.   Is the individual -- did you encounter somebody

21 there as you stood there?

22 A.   Yes.

23 Q.   Is the individual you encountered at that point

24 in the courtroom today?

25 A.   Yes.

1  Q.   Could you identify or point out something that
2  he is wearing?
3  A.   He is the male at the defense table wearing the
4  lime green shirt.
5          THE COURT:  The record will reflect that the
6  witness has identified the defendant.
7  BY MR. FRERES:
8  Q.   Prior to February 8, 2017, had you ever met the
9  defendant before?
10 A.   No.
11 Q.   Had any ever had any interaction with him?
12 A.   No.
13 Q.   Are you aware of anybody in VMEG having any
14 interactions with him?
15 A.   No.
16 Q.   At the time the defendant approached the
17 residence, was the search still going on inside?
18 A.   Yes.
19 Q.   This would have been after the kilo of cocaine
20 and the gun had been found, correct?
21 A.   Yes.
22 Q.   Were there also little children inside the
23 residence?
24 A.   Yes.
25 Q.   Could you just let this individual inside the

1  residence?

2  A.   No.

3  Q.   Why not?

4  A.   Mainly safety, officer safety, keeping the

5  integrity of the search, if he brings items in or

6  takes items with; we can't just let people walk

7  through a search and -- willingly.

8  Q.   You were still providing security at the scene

9  at the time?

10  A.   Yes.

11  Q.   Now can you describe what happened as the

12  defendant approached the front door?

13  A.   As he approached the front door, I notified

14  Agent Benschneider who was standing next to me, that

15  somebody's walking up.  As he stepped onto the front

16  step.  Like I believe it was a platform, I can't

17  remember correctly, but there was a step leading up

18  to the front door.  We stepped outside with him and

19  began talking to him, asking for his information.

20       I stepped past him down onto the pavement.

21  Agent Benschneider remained up by the door.  I

22  believe Agent Benschneider got his ID from him and

23  began doing the same process that we did with the

24  other three individuals: start gathering his

25  information, got his name and was on the phone with

1  communications, checking to see if he had any

2  warrants or had a valid driver's license or anything

3  of that nature.  And at that time I was talking to

4  the defendant while he was doing that.

5  Q.   What was the defendant wearing when he

6  approached the house?

7  A.   He had a -- I don't remember what color jeans.

8  He might have had jeans on.  He had a jacket over a

9  hoodie, and it was a hoodiless jacket over the top

10 of his hoodie.

11 Q.   Was his upper body remarkable in any way that

12 you noticed?

13 A.   I know that he had -- we noticed a lot of bulges

14 in his clothing, pocket areas.

15 Q.   Was the defendant alone at the time?

16 A.   Yes.

17 Q.   And was he carrying anything in his hand at the

18 time he approached?

19 A.   A Styrofoam cup in his, possibly, right hand.

20 Q.   At some point did he put down that cup?

21 A.   Yes.

22 Q.   And was that roughly around the time that one of

23 you asked for his identification?

24 A.   Yes.

25 Q.   Who would have done that?

```
 1  A.   Agent Benschneider.
 2  Q.   And did the defendant provide his
 3  identification?
 4  A.   Yes.
 5  Q.   And at that point in time you mentioned that
 6  Agent Benschneider was on the phone?
 7  A.   Yes -- well, agent -- once he got the ID from
 8  agent -- from David Lewis, he was on the call
 9  dispatch to talk on the phone, and that's how we ran
10  his name and identifiers.
11  Q.   What were you doing during this time?
12  A.   I was conversating with Mr. Lewis.  At that time
13  he was noticeably nervous.  He kept putting his
14  hands inside his pockets.  I was informing him not
15  to put his hands inside his pockets multiple times.
16  He would take them out and put them back in.  The
17  interaction only lasted about a minute.  At --
18  probably the third or fourth time I told him to take
19  his hands out of his pockets, told him, you know,
20  keep his hands out, and at that point he threw his
21  hands in the air and said that he had a gun on him.
22  Q.   Okay.  At the time -- you mentioned three or
23  four times you asked him to take his hands out of
24  his pockets.  Which pocket was he putting his hands
25  into?
```

1  A.   He was putting his hands into his jacket pocket.
2  The jacket pocket but not his hoodie pocket.
3  Q.   And what is your concern in the situation for an
4  individual having his hands in his pockets?
5  A.   At the time we knew nothing about him.  We knew
6  no knowledge of him.  We knew there was a kilo and
7  narcotics and firearms found in the residence that
8  we were at.  We were worried about safety weapons,
9  things of that sort, mainly weapons and officer's
10  safety.
11  Q.   Did the defendant ask to leave at some point or
12  indicate a desire to leave?
13  A.   Not that I remember.
14  Q.   Were you or Agent Benschneider standing there
15  with your weapons drawn?
16  A.   No.
17  Q.   Did either one of you ever pull your weapon
18  during the encounter?
19  A.   No.
20  Q.   Did the fact that a kilo of cocaine and a gun
21  had been found inside the residence color your
22  encounter at all that day?
23  A.   No.  We were just seeing who he was.
24  Q.   You are providing security for --
25  A.   Security, yes.

1  Q.   Do people come -- in your training and
2  experience, do people often come and go from drug
3  houses?
4  A.   Yes.
5  Q.   If you had information that an individual was
6  storing a large amount of cocaine, would you expect
7  people to come and go from drug houses?
8  A.   Yes.
9  Q.   And would that color how you would view somebody
10 arriving at that residence?
11 A.   There's a possibility.
12 Q.   Would you have just let Mr. Lewis turn away at
13 the time he approached the residence?
14 A.   At that point, no.  He was at the front door
15 when we stepped out to talk to him.  No, we needed
16 to identify him.
17 Q.   Would he still have presented a danger if you
18 just said "go away"?
19 A.   Yes.
20 Q.   Were you or Agent Benschneider able to complete
21 the warrant check at that time before he said I had
22 a gun?
23 A.   No.
24 Q.   At the time he said he had a gun, had anybody
25 searched him at that point?

1  A.   No.

2  Q.   Had anybody laid hands on him at all?

3  A.   No.

4  Q.   Drawn a weapon on him?

5  A.   No.

6  Q.   Did Agent Benschneider at some point tell him he

7  was going to pat the defendant down?  Did somebody

8  tell him he was going to pat him down or --

9  A.   Yes, I believe so.  Yes, when he had his hands

10 in the air, that's when we said that we were going

11 to pat him down or right in that time frame that's

12 when he threw his hands in the air.

13 Q.   Would that have been roughly the time that he

14 had -- after he pulled his hand out of the pockets

15 several times?

16 A.   Yes.

17 Q.   Once he told you he had a gun, what happened

18 from there?

19 A.   At that point we advised him not to move.  He

20 wasn't placed in cuffs yet.  We asked him where the

21 firearm was, said it was in his front hoodie pocket.

22 We removed the firearm from his hoodie pocket and

23 then placed him in handcuffs.  At that point the

24 firearm was made safe and further search was done of

25 his pockets.

```
 1  Q.   What else did you find during the search?
 2  A.   Found a large amount of currency in his top
 3  jacket pocket.  We also found narcotics in his
 4  jacket pocket where he was putting his hands, and I
 5  believe other than personal effects, that's all that
 6  we found.
 7  Q.   There was also a cell phone?
 8  A.   A cell phone, yes.
 9  Q.   Some cigarettes?
10  A.   Yes.
11  Q.   This gun was a handgun, correct?
12  A.   Yes.
13  Q.   But this was a -- is it a bulky revolver?
14  A.   It is a revolver that has the ability to shoot
15  shotgun shells and long C.O.A.L. rounds.
16  Q.   At that time was the defendant placed under
17  arrest?
18  A.   Yes.
19  Q.   And was he transported to the jail at that
20  point?
21  A.   Yes.
22  Q.   Was the search still going on at the time he was
23  transported?
24  A.   Yes.
25  Q.   Do you know approximately what time it would
```

1 have been that he was transported to the jail?

2 A.    I can't honestly say, possibly 2:05.  It was

3 very quick when we got there.

4 Q.    Okay.  Was Terrance Liggins still inside at the

5 time the defendant was taken to the Danville jail?

6 A.    Yes.

7 Q.    Was DEA still searching?

8 A.    Yes.

9 Q.    Now you are a drug agent with experience

10 investigating drug crimes, correct?

11 A.    Yes.

12 Q.    In your experience, do drug traffickers often

13 carry firearms?

14 A.    Yes.

15 Q.    And you've also testified I believe that you

16 would expect people -- let me ask a different way.

17 Have you ever conducted surveillance on a drug

18 house?

19 A.    Yes.

20 Q.    Do people frequently come and go from a drug

21 house?

22 A.    Yes.

23 Q.    And what's their purpose often when they are

24 coming and going from a drug house?

25 A.    Either to receive narcotics, drop off money, or

1  use different things like that.

2          MR. FRERES:  I have no further questions.

3          THE COURT:  Okay.  Thank you.

4          Cross.

5                    CROSS-EXAMINATION

6  BY MS. POLLOCK:

7  Q.   Good morning.  How are you doing?

8  A.   Pretty good.

9  Q.   So when this search occurred, you said that you

10 had been with VMEG for three years; is that right?

11 A.   When the search occurred -- I have been there

12 three years now.  When the search occurred, roughly

13 a year.

14 Q.   You said that you arrived after the DEA was

15 already inside the residence?

16 A.   Yes.

17 Q.   And they entered the residence at approximately

18 2:00 p.m.; is that right?

19 A.   I believe so.  I don't know.

20 Q.   And you said that Mr. Lewis showed up very

21 quickly thereafter; is that what you testified to?

22 A.   When we showed up, yes.

23 Q.   Right.  But before he showed up you went and

24 talked to multiple different individuals who were

25 parked outside of the house?

50

```
 1  A.   We talked to three individuals before.
 2  Q.   In two different cars?
 3  A.   Yes.
 4  Q.   And you said that you cleared them and then they
 5  turned around to leave?
 6  A.   Yes.
 7  Q.   You sent them away at separate times?
 8  A.   Yes.
 9  Q.   Now --
10        MS. POLLOCK:  Your Honor, may I approach the
11  witness?
12        THE COURT:  You may.
13        MS. POLLOCK:  Your Honor, I apologize.  I do
14  not have a courtesy copy of the photographs for you.
15        THE COURT:  That's fine.
16  BY MS. POLLOCK:
17  Q.   I'm handing you what has been previously marked
18  for identification as Defendant's Exhibit Number 1.
19  It is actually a group exhibit with multiple
20  photographs.
21        Can you just look through those quickly?
22  A.   Yes.
23        THE COURT:  How many photographs?
24        THE WITNESS:  Six.
25        THE COURT:  Six?
```

1          MS. POLLOCK:  Six.

2          THE COURT:  We will just call it D1-A

3   through F.

4   BY MS. POLLOCK:

5   Q.   You recognize that intersection on D1-A as being

6   the intersection of Voorhees and Sherman Street?

7   A.   Yes.

8   Q.   Do you see where Mr. Liggins' residence is on

9   that photograph?

10  A.   On this photograph -- on the second one I can,

11  but I can't on this first one.

12  Q.   Okay.  Go ahead and flip it over.

13          On the second one, can you take my pen

14  please and circle the residence that you believe to

15  be Mr. Liggins' residence?

16  A.   I believe -- I can't make it out on this one

17  either.  I know they were both white houses.

18  Q.   Okay.  You can flip to the next one and see if

19  it's visible?

20  A.   So it would be this one.

21  Q.   And that's a depiction of a white house with a

22  red chimney; is that correct?

23  A.   Yes.  My memory isn't -- I can't remember quite

24  what the house looked like.

25  Q.   Go ahead and flip to the next one.

1  A.   I believe this is it.

2  Q.   Thank you.

3       All right.  Flip to the next photograph

4  please.

5       Is that a head-on view of the porch at 1219

6  Sherman Street as you remember it?

7  A.   I believe so.

8  Q.   Can you see the numbers there on the photograph?

9  A.   Yes.

10 Q.   And what's the number?

11 A.   1219.

12 Q.   And that is Mr. Liggins' residence, correct?

13 A.   I believe so.  We had not done an investigation

14 on him, so I believe this is his.

15 Q.   Well, you reviewed your reports in advance of

16 today's case, correct?

17 A.   Yes.

18 Q.   And you remember that 1219 Sherman Street is the

19 address in question?

20 A.   Yes.

21 Q.   Thank you.

22       MS. POLLOCK:  Your Honor, at this time the

23 Defense moves to admit D1-A through F into evidence.

24       MR. FRERES:  I don't think I have an

25 objection.

1         No objection, Your Honor.

2         THE COURT:  Okay.  They are admitted.

3  BY MS. POLLOCK:

4  Q.   You had a chance to look at those photographs.

5  The porch depicted is pretty small, correct?

6  A.   Yes.

7  Q.   Just a couple of steps and then a concrete slab,

8  maybe big enough for a couple of people?

9  A.   Yes.

10 Q.   You testified on direct that you were standing

11 inside of the door when Mr. Lewis approached?

12 A.   Yes.

13 Q.   And the distance between the door and the

14 sidewalk is also relatively small, maybe 15 feet or

15 so?

16 A.   Possibly, yes.

17 Q.   Does that sound, right?

18 A.   Yes.

19 Q.   You didn't measure it but it's pretty close?

20 A.   Yeah.

21 Q.   And that's a residential neighborhood with

22 multiple houses, correct?

23 A.   Correct.

24 Q.   And do you remember how many cars were parked on

25 the street that day?

1  A.   At the time I do not remember any when Mr. Lewis

2  showed up.

3  Q.   Did you observe anyone else walking down the

4  street?

5  A.   Not that I can remember.

6  Q.   Those other individuals who you said you ran

7  their names and checked for warrants, what service

8  did you use to check for those warrants?

9  A.   We called our cell phones to the Danville

10 dispatch, ran them that way.

11 Q.   Okay.  And what agencies did you use to use the

12 request?

13 A.   It would have been whatever Danville PD uses,

14 their dispatch.

15 Q.   That is LEADS, correct?

16 A.   I don't know.  I assume that's what they use,

17 yes.

18 Q.   If you run a name and check for warrants, what

19 service do you use?

20 A.   It would be LEADS.

21 Q.   Okay.  Thank you.

22      MS. POLLOCK:  May I approach, Your Honor?

23      THE COURT:  You may.

24 BY MS. POLLOCK:

25 Q.   Handing what you has been previously marked for

1  identification as Defendant's Exhibit Number 2.

2          Please flip to the third page of that.

3          MS. POLLOCK:  Here is a courtesy copy, Your

4  Honor.

5  BY MS. POLLOCK:

6  Q.   Do you see that subpoena there?

7  A.   Yes.

8  Q.   And that subpoena is directed to LEADS from my

9  office, correct?

10  A.   Correct.

11  Q.   What does that subpoena request?

12  A.   List of all warrant checks performed by

13  Mr. Lewis -- on Mr. Lewis, VMEG office, officer

14  participating in Mr. David Lewis' arrest on 2/8/17,

15  including but not limited to Officer Bowman and

16  Officer Benschneider; copy of LEADS request sent in

17  by Officer Bowman and Officer Benschneider on the

18  date of Mr. Lewis' arrest.  Note this request is for

19  record only.

20  Q.   All right.

21          MS. POLLOCK:  So I would like the Court at

22  this time to take judicial notice that this subpoena

23  was sent in return and there is a business record

24  affidavit attached thereto.

25          THE COURT:  Are you seeking admission?

1          MS. POLLOCK:  I will eventually, Your Honor.
2          THE COURT:  Okay.  That's fine.
3    BY MS. POLLOCK:
4    Q.   So, that subpoena, directed to the Illinois
5    State Police, the LEADS service, which is what the
6    Danville police used to run warrant checks, that
7    return, according to their office, all records of
8    any warrant checks run on David Lewis on that date,
9    correct?
10   A.   Correct.
11   Q.   Now, flip to the front page please.
12          That -- what is the first time that a check
13   was run on David Lewis?
14   A.   It would be -- what does that say?  15:35:07.
15   Q.   That's military time.  What is that in Standard
16   Central Time?
17   A.   3:35.
18   Q.   3:35 p.m.  So no record of any warrant checks
19   run on David Lewis prior to that time on that date
20   according to this, correct?
21   A.   That would be correct, yes.
22   Q.   Go ahead and flip to the second page.
23          What is the last time that a record search
24   was run through LEADS on Mr. Lewis?
25   A.   I'm not sure exactly how to read this.  Last

1  time would be 19:43:20 is on the list.

2  Q.   What is that in our normal time?

3  A.   Is that 7:43?

4  Q.   All right.

5       MS. POLLOCK:  Your Honor, at this time

6  defense moves to admit Exhibit 2 into evidence.

7       MR. FRERES:  No objection.

8       THE COURT:  Admitted.

9  BY MS. POLLOCK:

10  Q.   All right.  Now David Lewis -- you said that you

11  didn't remember exactly when he was brought to the

12  jail; is that right?

13  A.   No, I don't remember exactly what time, no.

14  Q.   Would a copy of the Vermilion County Sheriff's

15  Department jail report refresh your recollection in

16  that regard?

17  A.   Possibly, yes.

18       MS. POLLOCK:  May I approach, Your Honor?

19       THE COURT:  You may.

20  BY MS. POLLOCK:

21  Q.   Please take a look at that and see if you find

22  David Lewis's name?

23  A.   Yes.

24  Q.   And what time was he admitted into the jail?

25  A.   It would be 1435 hours; so, is that 2:35?

```
 1  Q.   Thank you.
 2        As part of your duties with VMEG, you write
 3  reports, right, of what happens during your
 4  investigation?
 5  A.   Correct.
 6  Q.   And in this case you wrote several reports,
 7  correct?
 8  A.   I wrote one -- I did evidence as well, so, yes.
 9  Q.   What do you mean you "did evidence"?
10  A.   Evidence from what was taken at the scene.  I
11  believe that was tied to the Liggins's case.
12  Q.   So you were acting as the evidence custodian for
13  the investigation?
14  A.   I believe so, yes.
15  Q.   What does that mean?  What do you do?
16  A.   I collect evidence, keep chain of custody.
17  Q.   And chain of custody is important to you,
18  correct?
19  A.   Yes.
20  Q.   So you are responsible for writing everything
21  down appropriately in the report; yes?
22  A.   Yes.
23  Q.   And under VMEG's policy and procedures, that
24  report then gets entered into an online system,
25  correct?
```

```
 1  A.   Yes.
 2  Q.   And somebody has to approve that report, right?
 3  A.   Yes.
 4  Q.   Who would that be?
 5  A.   That would be our master sergeant.
 6  Q.   Who is that?
 7  A.   Lisa Mitchell.
 8  Q.   So when she approves a report that comes to her
 9  through a chain of review, she initials it, right?
10  A.   Initial, signature, yes.
11  Q.   And dates it?
12  A.   Yes.
13  Q.   And in this case your reports that were for
14  evidence, chain of custody, she reviewed and
15  initialed them and dated those, correct?
16  A.   Yes.
17  Q.   Now you wrote another report in this case,
18  right?
19  A.   Yes.
20  Q.   And that was the supplemental police report that
21  is dated 2/8/2017.
22       I'm sure that you recall this from previous
23  litigation, right?
24  A.   Yes.
25  Q.   And that report was actually not written on the
```

1  date of the incident, correct?

2  A.  Correct.

3  Q.  It was in fact written on February 21st, 2017,

4  close to 4:57 p.m.  Does that sound right?

5  A.  I'd have to see it; I don't quite remember.

6        MS. POLLOCK:  May I approach, Your Honor?

7        THE COURT:  You may.

8  BY MS. POLLOCK:

9  Q.  I'm handing you what has been previously marked

10 as Defendant's Exhibit Number 3.

11       Do you recall as a part of this case that

12 the date and time that this report was written

13 became an issue, don't you?

14 A.  Yes.

15 Q.  And this is a copy of the metadata from that

16 supplemental report that you drafted, correct?

17 A.  Correct.

18 Q.  And it was entitled supplemental report with

19 "supplemental" spelled incorrectly, right?

20 A.  Correct.

21 Q.  And you can see on the location there it was

22 saved on the VMEG "V" drive under the David Lewis

23 case, correct?

24 A.  Yes.

25 Q.  And that report, according to this, was created

1  on Tuesday, February 21st at 4:57 p.m. and

2  26 seconds, correct?

3  A.   Correct.

4  Q.   This is also the day that the David Lewis had

5  his primary hearing in the Vermillion County Circuit

6  Court, correct?

7  A.   Possibly.  I don't remember.

8  Q.   Did you attend that hearing?

9  A.   Possibly did, yes.

10  Q.   Did you testify in that hearing?

11  A.   I was not the case agent at the time.

12  Q.   Did you testify at the hearing?

13  A.   I'm not sure, honestly.

14  Q.   Did you have any discussions with anyone after

15  the preliminary hearing regarding what your report

16  contained or lacked?

17  A.   Possibly the state's attorney I would have

18  talked to.

19  Q.   Did they ask you to write a supplemental report?

20  A.   No.

21  Q.   That was just a coincidence that it happened on

22  that day?

23  A.   Yes.

24       MS. POLLOCK:  Now -- Your Honor, defense

25  moves to admit Defendant's Exhibit Number 3 into

1  evidence.

2          MR. FRERES:  No objection.

3          THE COURT:  It's admitted.

4          MS. POLLOCK:  May I approach again, Your

5  Honor?

6          THE COURT:  You may.

7  BY MS. POLLOCK:

8  Q.   I'm handing you what has been previously marked

9  for identification as Defendant's Exhibit 4.

10          That is very, very, very difficult to read,

11  I understand.  But do you remember having to pull

12  the metadata and taking two photographs of that

13  metadata for Mr. Lewis's state case?

14  A.   Yes.

15  Q.   Now I know that it is hard to read, but if you

16  look down on the right where it says "created," to

17  the right of there there is the number five.

18          Do you see that?

19  A.   I see -- yeah, I see a "five" to the very far

20  right.

21  Q.   All right.  So my question for you is how many

22  reports did you write?

23  A.   It would be evidence reports, the supplemental

24  that's in question, and a 4-2.

25  Q.   Let me rephrase that.  How many versions of this

1  supplemental report did you write?

2  A.   It would have been one.

3  Q.   Then how do you explain that the metadata from

4  one of them says that it was created after 5:00 p.m.

5  and the metadata from the other says that it was

6  created at 4:57 p.m.?

7  A.   I could not tell you if that -- I just see a

8  five.  I don't see as far as time.  I could not tell

9  you.

10  Q.   So, you are saying here that you don't have two

11  different versions of that report?

12  A.   No.

13  Q.   In that report that you wrote, the supplemental

14  report, you titled it "to document the entry into

15  the case files of the laboratory results."

16        Do you recall that?

17  A.   Yes.

18  Q.   That's not what the report was about, was it?

19  A.   No.

20  Q.   In fact the lab results had not even been

21  received at that point, had they?

22  A.   No.

23        MS. POLLOCK:  Your Honor, before I forget, I

24  move to admit Defendant's Exhibit 4 into evidence.

25        MR. FRERES:  No objection.

1        THE COURT:  Admitted.

2  BY MS. POLLOCK:

3  Q.   In that report and in all of the reports that

4  you wrote, you did not mention any of the

5  individuals on whom you ran previous warrant checks,

6  correct?

7  A.   Correct.

8  Q.   You did not record any of their names, right?

9  A.   Right.

10  Q.   Did not write anything down about anything else

11  that happened that day?

12  A.   Correct.

13  Q.   The report that you actually wrote, even though

14  it is dated February 8th, was not written until two

15  weeks later, correct?

16  A.   That would be correct, yes.

17  Q.   And it was written after Mr. Lewis's preliminary

18  hearing, and it has some details in it that are not

19  in anyone else's reports.  Are you aware of that?

20  A.   I am not.

21  Q.   What was your knowledge of the encounter with

22  Terrance Liggins when you arrived at the property?

23  A.   DEA was there conducting a search.

24  Q.   Do you know what was happening inside?

25  A.   They had people on -- somebody in custody and

 1 they had evidence.

 2 Q.   Do you know what the evidence was?

 3 A.   It would be -- I believe it was the kilo of

 4 cocaine and firearms.  I don't know if it was one or

 5 two.

 6 Q.   So when you were standing at the front door

 7 looking out, you were inside the house, correct?

 8 A.   Yes.

 9 Q.   Could you see Mr. Liggins from where you were?

10 A.   Possibly.  I don't remember -- recall seeing

11 him.  I don't remember what he looks like.  We

12 didn't have an investigation on him at the time.

13 Q.   Do you recall seeing any other people who were

14 not law enforcement agents?

15 A.   Yes.  There were three children sitting on a

16 couch.

17 Q.   Was everything calm at that point?

18 A.   Yes.

19 Q.   And the individuals, the adults anyway, were

20 being cooperative?

21 A.   Yes.

22 Q.   Did anybody have their weapons drawn?

23 A.   No.

24 Q.   You felt as though the house at that point, the

25 perimeter, had been secured; yes?

1  A.    Inside the residence was secured.

2  Q.    Correct.  And people -- I think you testified

3  that you were sending people away?

4  A.    Yes.

5  Q.    Who were not -- shouldn't have been there,

6  right?

7  A.    Yes.

8  Q.    At that point were you afraid for your safety?

9  A.    I was not at that time, no.

10  Q.    When Mr. Lewis approached, did you have anything

11  in your hands?

12  A.    I did not, no.

13  Q.    Where was the evidence that you were acting as

14  custodian of?

15  A.    At that point I was not acting as a custodian

16  for any evidence.

17  Q.    So you picked up the evidence later?

18  A.    Yes, at PSP.

19  Q.    Who else was standing beside you besides Agent

20  Benschneider?

21  A.    I believe that would be just me and him at the

22  front door.  It was a very small area.

23  Q.    When you walked out of the house from that very,

24  very small porch, you saw David Lewis, correct?

25  A.    Yes, as he was walking up the stairs.

1  Q.   And you flanked him, correct?

2  A.   I stepped past him because there was not a lot

3  of room on the top.

4  Q.   So Agent Benschneider was on the porch and you

5  were behind him blocking -- well, in between him and

6  the sidewalk?

7  A.   Yeah.

8  Q.   And you were dressed in tactical gear you said?

9  A.   It would have been jeans, a T-shirt, and a

10  police vest over the top of it.

11  Q.   And a gun?

12  A.   Yes.

13  Q.   And a radio, I assume?

14  A.   I assume so.

15  Q.   You look like a cop, right?

16  A.   Yeah.

17  Q.   Now after you flanked him, you asked him what he

18  was doing there, right?

19  A.   I believe -- I don't remember exactly how the

20  conversation went, but they were, "hi, police,

21  search warrant" -- not a search warrant but "a

22  consent search at the time, and need some

23  identification."

24  Q.   And he gave you some identification?

25  A.   Right.

1  Q.   From his pocket, right?

2  A.   Yes.

3  Q.   And just from your recollection this was in

4  early February, correct?

5  A.   I think it was cold at that point in time, yes.

6  Q.   Ice cold?

7  A.   Yes.

8  Q.   Under freezing, correct?

9  A.   I wouldn't say under freezing, but it was cold.

10  Q.   And he was cooperative, correct?

11  A.   Yes.

12  Q.   And your testimony is that you said you were

13  going to search him and he threw up his hands and

14  declared that he had a firearm?

15  A.   After putting his hand in his pocket, yes.

16          MS. POLLOCK:  Nothing further at this time,

17  Your Honor.

18          THE COURT:  Okay.  Thank you.

19          Any redirect?

20          MR. FRERES:  Yes, Your Honor.

21          Does the Court have copies of all of this

22  stuff or should I use the ELMO?

23          THE COURT:  It's up to you.  Do you need

24  the copies back?

25          MR. FRERES:  I have them.  I just wanted to

 1 make sure that you have them, Judge, as I'm going to
 2 go through some of the stuff here.
 3         You have a copy of Defense Exhibit 2, for
 4 example?  Let me just put it up here.
 5         THE COURT:  Are you going to examine the
 6 witness?
 7         MR. FRERES:  Yes.
 8         THE COURT:  Then go ahead and examine him.
 9                  REDIRECT EXAMINATION
10 BY MR. FRERES:
11 Q.  All right.  So I'm going to -- Agent Bowman, I'm
12 going to put on the screen here what has been
13 admitted as Defense Exhibit 2.
14         And this is the Illinois State Police LEADS
15 log there at the time the warrant of the check was
16 issued?
17 A.  Yes.
18 Q.  And the time on there shows 3:35, correct?  And
19 I know that it is hard to see.  Up there at the top.
20 I think that you have it on your screen.
21 A.  Correct.  Yes.
22 Q.  Now this would have been well after the
23 encounter, correct?
24 A.  Yes.
25 Q.  Mr. Lewis was already in custody and booked in

1  the jail at this point, correct?

2  A.   Correct.

3  Q.   Can you run LEADS at any point in time?

4  A.   Yes.

5  Q.   Is it frequent to run a LEADS check, complete a

6  LEADS check for criminal history and other things

7  even after someone is in custody?

8  A.   Correct.

9  Q.   Were you and Agent Benschneider able to complete

10  the warrant check before you indicated that he had a

11  firearm on scene?

12  A.   No, we were not.

13  Q.   Now you were also asked about your contact with

14  the other individuals.  Did you follow-up to see if

15  there was any record checks of the warrant checks

16  for each of them that were loitering out of the

17  house?

18  A.   The only check we made was the initial, nothing

19  came back, so....

20  Q.   Would there be any record if nothing came back?

21  A.   No, there wouldn't be any record, no.

22  Q.   Now you were also asked about the evidence

23  custodian.  You weren't the evidence custodian for

24  everything seized from the house that day, were you?

25  A.   No.

1  Q.   Were you the evidence custodian for the stuff
2  seized from Mr. Lewis?
3  A.   Yes.
4  Q.   And for some of the stuff seized from the house
5  as well, correct?
6  A.   Yes.
7  Q.   But not the kilo of cocaine?
8  A.   Not for the kilo of cocaine.
9  Q.   DEA took custody of that?
10 A.   They did.
11 Q.   And you dealt with the evidence custodian issue
12 well after you have dealt with Mr. Lewis and
13 completed your incident with him, correct?
14 A.   Correct.
15 Q.   Now you were asked if Mr. Lewis was cooperative.
16 Was he actually cooperative the entire time?
17 A.   He was polite, but he repeatedly would not keep
18 his hands out of his pockets when asked to do so.
19 Q.   When you initially said that he was cooperative,
20 is that fair to say that he was polite?
21 A.   Yes, he was polite.
22 Q.   But he was resisting your commands, correct?
23 A.   He was not following my commands, no.
24       MR. FRERES:  No further questions.
25       MS. POLLOCK:  No further questions.

```
 1            THE COURT:  Thank you.  You may step down.
 2            Do you have further witnesses, Mr. Freres?
 3            MR. FRERES:  I believe we have Cody
 4   Benschneider.
 5            THE COURT:  Let's take a ten-minute recess
 6   at this time.
 7               (A recess was taken.)
 8            MR. FRERES:  Your Honor, I think in the
 9   interest of time, I think Miss Pollock and I have
10   agreed, if we could reopen redirect for a couple of
11   questions with Agent Bowman, we may be able to
12   excuse the fourth witness.
13            THE COURT:  You may.
14            MS. POLLOCK:  No objection, Your Honor.
15            MR. FRERES:  Okay.  Recall Michael Bowman
16   for a few more questions.
17            THE COURT:  All right.
18            And, sir, you're still under oath.
19            THE WITNESS:  Yes.
20            MR. FRERES:  May I, Your Honor?
21            THE COURT:  You may.
22              REDIRECT EXAMINATION (continuing)
23   BY MR. FRERES:
24   Q.   Agent Bowman, I neglected to ask you, you were
25   addressed on cross about your report on this.  Do
```

1  you recall that?

2  A.   Yes.

3  Q.   Your report here, I think it's fair to say I

4  think you admitted on cross was several days later,

5  correct?

6  A.   Yes.

7  Q.   At the time you created it, did you copy and

8  paste the narrative into the section of another

9  report?

10 A.   Yes.

11 Q.   Can you explain to us what happened on this and

12 when the circumstances of the report, why it was

13 never approved by your supervisor?

14 A.   I submitted the report originally.  We put in

15 mailboxes.  Our master sergeant takes them and

16 she'll either read through all of them and then mark

17 what needs to be fixed.  At the time I was a fairly

18 new agent so I need a lot fixed.  She will kick them

19 back to us, give them back to us.  I received it

20 back and never resubmitted it to be -- resubmitted a

21 fixed copy, never even fixed it.  And I think it

22 either got -- the working document that is on our

23 share drive stayed the same until I fixed it.

24 Q.   The errors in the report, did any of it relate

25 to the narrative or was it the things in the title,

1 such as the reference to laboratory results, which
2 had never been done?
3 A.   Yeah, a lot of copy and paste.  I used a
4 supplemental for lab results and never fixed the lab
5 result portion.
6 Q.   Is that why there is not an approved --
7 supervisor approved because you never resubmitted
8 it?
9 A.   I never resubmitted it.
10 Q.   Were there any issues of the narrative of this
11 report?
12 A.   Not that I know of except maybe grammatical
13 errors.
14 Q.   Did you prepare multiple copies of the report?
15 A.   No.
16        MR. FRERES:  No further questions.
17        THE COURT:  Okay.  Thank you.
18        Any cross?
19             RECROSS-EXAMINATION
20 BY MS. POLLOCK:
21 Q.   Are you aware of the date that this report was
22 disclosed to the assistant state's attorney who is
23 handling Mr. Lewis's case in Vermilion County?
24 A.   I know that it was given to them.  I don't know
25 the date.

1  Q.   Does August 2nd, 2017, sound familiar?

2  A.   Possibly.

3  Q.   That was the day before a hearing on the Motion

4  to Suppress that Mr. Lewis filed in state court?

5  A.   Yes.

6  Q.   And still it was unsigned and unapproved,

7  correct?

8  A.   Yes.

9           MS. POLLOCK:  Okay.  Thank you.

10           Nothing further.

11           THE COURT:  Okay.  Thank you.

12           Any redirect?

13                FURTHER REDIRECT EXAMINATION

14  BY MR. FRERES:

15  Q.   The metadata on the report shows that you

16  created it well before that, correct?

17  A.   Correct.

18  Q.   And had you made any changes in the interim?

19  A.   No.

20           MR. FRERES:  That's it.

21           MS. POLLOCK:  No recross, Your Honor.

22           THE COURT:  Thank you.  You may step down.

23           The government may call its next witness.

24           MR. FRERES:  Cody Benschneider.

25                   CODY BENSCHNEIDER,

1 after having been duly sworn, testified as follows:

2                     DIRECT EXAMINATION

3 BY MR. FRERES:

4 Q.   Good morning.

5 A.   Good morning.

6 Q.   Will you please state your name and spell your

7 last name for our record?

8 A.   Cody Benschneider, B-e-n-s-c-h-n-e-i-d-e-r.

9 Q.   How are you currently employed?

10 A.   I am employed through the Village of Tilton.

11 Q.   As a police officer?

12 A.   Yes, sir.

13 Q.   And have you always worked with Tilton as a law

14 enforcement officer?

15 A.   No.

16 Q.   How long have you been with Tilton PD?

17 A.   Just shy of two years.

18 Q.   Prior to that did you work with any other law

19 enforcement agency?

20 A.   Yes, I did.

21 Q.   What agency would that be?

22 A.   I work for the Vermilion County Metropolitan

23 Enforcement Group commonly known as VMEG.

24 Q.   Is VMEG a task force that operates out of

25 Vermilion County?

1  A.   Yes.

2  Q.   What is your current title with Tilton PD?

3  A.   Police officer.

4  Q.   And is it a small department?

5  A.   Yes, very small.

6  Q.   What was your title when you were with VMEG?

7  A.   I was a special agent.

8  Q.   Since our issue here today involved your time

9  with VMEG, what types of things did you investigate

10 while you were with VMEG?

11 A.   Drug and gun investigations.

12 Q.   Now as part of your law enforcement duties, do

13 you frequently collaborate with other agencies?

14 A.   Yes.

15 Q.   I'm going direct your attention to February 28,

16 2017.

17        Were you involved in an investigation in

18 Danville that day?

19 A.   Yes.

20 Q.   Were you working with VMEG or Tilton PD that

21 day?

22 A.   I was working with VMEG.

23 Q.   Was VMEG the lead agency on this investigation?

24 A.   No, they were not.

25 Q.   Who was?

1  A.   It was the DEA Chicago division.

2  Q.   How did you get involved in the investigation?

3  A.   It would have been one of our supervisors

4  contacted us to assist the DEA agents.

5  Q.   And what, if anything, did you do?

6  A.   Upon arrival, I assisted DEA agents with

7  perimeter security.

8  Q.   Stepping back here for a second.  Was the DEA

9  requesting your assistance at 1219 Sherman Street?

10  A.   Correct.

11  Q.   And is that in Danville?

12  A.   Yes, it is.

13  Q.   Had you been involved in the investigation prior

14  to that point?

15  A.   No.

16  Q.   At the time you arrived -- well, let me ask you

17  this way.  I apologize.

18         Did you go to 1219 Sherman Street?

19  A.   Yes.

20  Q.   On February 8th?

21  A.   Yes.

22  Q.   Approximately what time did you arrive?

23  A.   Approximately 2:00.

24  Q.   Was anybody else with you?

25  A.   Yes.  It would have been myself and Special

1  Agent Bowman.  I believe there might have been a
2  couple other VMEG agents but I'm not for certain.
3  Q.   And what did you do when you arrived at 1219
4  Sherman?
5  A.   We briefly spoke with the DEA agents, asked how
6  we could assist, and they asked us to assist by
7  securing the perimeter.
8  Q.   Okay.  Did you learn anything about what was
9  going on at that time?
10  A.   Yes.
11  Q.   What was -- what were they doing?
12  A.   They were conducting a consent search at the
13  residence and they've located approximately one kilo
14  of cocaine and one loaded firearm.
15  Q.   Inside that residence?
16  A.   Yes, inside the residence.
17  Q.   Was the search still ongoing at the time you
18  arrived?
19  A.   Yes.
20  Q.   After they asked you to assist with perimeter
21  security, what did you do?
22  A.   Myself and Special Agent Bowman started outside.
23  In February it is very cold.  I don't know time
24  frames.  There is one vehicle that came to the
25  residence.  We introduce ourselves as police.

1 Identify ourselves.  Explained that there is a
2 consent search going o, and that we would check
3 their names for warrants.  I don't know if that
4 would have been a local check or a warrant check.
5 And that way their names are documented somehow and
6 they were -- they left.
7 Q.   Were there multiple people you encountered on
8 scene milling about outside?
9 A.   Yes, there were at least two vehicles that
10 showed up at the residence.
11 Q.   Did you take the same process with both of them?
12 A.   Correct.
13 Q.   Asked for identification?
14 A.   Yes.
15 Q.   Run a check for any pending warrants?
16 A.   Correct.
17 Q.   And then let them go?
18 A.   Correct.
19 Q.   After the individuals were cleared from outside,
20 what did you and Agent Bowman do?
21 A.   Myself and Agent Bowman were standing inside the
22 residence with the main door open, the screen door
23 shut, and we were able to observe the outside of the
24 residence, the front of the outside of the residence
25 to encounter if anybody showed up.

1  Q.   And as you were doing this, was the search still

2  going on inside?

3  A.   Yes, it was.

4  Q.   Was Terrance Liggins still inside?

5  A.   Yes, but I had no knowledge of where he was at

6  inside the residence.

7  Q.   Were there any other civilians inside the

8  residence?

9  A.   Yes, there were.

10  Q.   And who or what would those have been?

11  A.   I don't know their names.  There were several

12  people sitting on the couch; their children sitting

13  in the same room as the adults, and they were in the

14  front room, which is where we were standing at.

15  Q.   All right.  At the time a search is going on, is

16  this a dangerous situation for law enforcement?

17  A.   Yes, it is.

18  Q.   Is it a dangerous situation for any civilians

19  who are there?

20  A.   Yes.

21  Q.   What are some of the dangers that you are

22  concerned about?

23  A.   Well, one, there was a loaded firearm located

24  inside the residence.  We don't know if there were

25  any other loaded firearms inside the residence.  And

1  there is also a dangerous drug, narcotics located.

2  Q.   Could you just let somebody who approaches the

3  scene inside the house while this is going on?

4  A.   What's that?

5  Q.   Would it have been safe to just let somebody

6  inside the house as this is going on, the search?

7  A.   No.

8  Q.   Would it jeopardize the investigation?

9  A.   It could.

10  Q.   New arrival, could they also create confusion?

11  A.   Yes.

12  Q.   Could they introduce evidence that may not have

13  been there?

14  A.   Yes.

15  Q.   Could they themselves also be carrying firearms

16  and present a danger?

17  A.   Yes, they do.

18  Q.   You mentioned that you were standing there just

19  inside the front door, correct?

20  A.   Correct.

21  Q.   Was the screen door closed?

22  A.   The screen door was closed but there was -- I

23  don't know if there was a screen or a glass front

24  but you could see out.

25  Q.   I suppose -- would you have been standing back

1  or would you have been immediately visible from the

2  outside?

3  A.   I assume so.  I'm not for certain.

4  Q.   Now as you stood there, while the search was

5  going on, did somebody eventually approach the front

6  door of the house?

7  A.   Yes.

8  Q.   Did you have an encounter that day with that

9  individual?

10  A.   Yes, I did.

11  Q.   Is the individual that you encountered inside

12  the courtroom today?

13  A.   Yes.

14  Q.   Would you please identify him or her and point

15  out what he is doing?

16  A.   He is the middle subject sitting at the

17  defendant's table wearing a lime green shirt.

18        THE COURT:  The record will reflect that the

19  witness has identified the defendant.

20  BY MR. FRERES:

21  Q.   Now at the time the defendant approached the

22  house, was DEA still inside conducting the search?

23  A.   Yes, they were.

24  Q.   Was Terrance Liggins still inside?

25  A.   Yes.

1  Q.   And were the children still inside?

2  A.   Yes.

3  Q.   What, if anything, happened at the time the

4  defendant approached the front door?

5  A.   The defendant approached the front door.  Myself

6  and I Special Agent Bowman exited the front door.

7  We were both wearing our police issued department

8  outer vests that identified us as police.  I had my

9  badge on my right hip along with my firearm.

10  Q.   Okay.  Did you draw weapons on the defendant at

11  that time?

12  A.   No, my weapon was holstered.

13  Q.   Did Agent Bowman?

14  A.   No, he did not.

15  Q.   At any point with your encounter with the

16  defendant, did either one of you draw weapons on the

17  defendant?

18  A.   We did not, no.

19  Q.   Now there -- what did you say to the defendant

20  when he came to the front door?

21  A.   We identified ourselves as police officers,

22  explained that we were doing -- assisting in a

23  consent search and no one was allowed to enter the

24  residence.

25  Q.   And how did he react to that?

1  A.   I don't recall exactly.

2  Q.   Did you ask for anything from him?

3  A.   Yes.  I asked for identification which he

4  provided.

5  Q.   Did he have a Styrofoam cup in his hand?

6  A.   I don't recall the Styrofoam cup, personally,

7  no.

8  Q.   Did he reach into his pocket to get the

9  identification?

10  A.   Yes, he would have reached -- I believe one of

11  his back pockets, and it was inside of a wallet.

12  Q.   Did he provide an identification to you?

13  A.   Yes, he did.

14  Q.   Did you tell him what you were going to doing at

15  that point?

16  A.   Correct.

17  Q.   What did you tell him?

18  A.   I advised him that I was going to run his

19  information through communications, either check for

20  a local check or a warrant check.  I don't know if I

21  was personally writing down the information or if I

22  had his ID in my hand.

23  Q.   If the checks were cleared, would you tell him

24  he could leave if the checks were cleared?

25  A.   Yes, I did.

1  Q.   How did he react to that?

2  A.   I believe he was wanting to leave fairly

3  quickly.

4  Q.   At some point did you observe anything going on

5  with the defendant?

6  A.   I did.

7  Q.   What, if anything, did you observe?

8  A.   I observed it was in a -- like a plastic bag, a

9  large amount of United States currency, which was in

10 his inner coat pocket.  From where I was standing

11 at, I could look down and see it.  He had his coat

12 open but he had a hoodie.  He had the coat over his

13 hoodie but the coat was unzipped.

14 Q.   Did the defendant express a desire to leave?

15 A.   Yes, he did.

16 Q.   Did you start to do anything with his

17 identification?

18 A.   Yes.

19 Q.   What did you do?

20 A.   I was in the process of trying to contact

21 communications.  And at this time I heard Special

22 Agent Bowman ordering the defendant to take his

23 hands out of his pockets, take his hands out of his

24 pocket; I would say at least two or three times.  So

25 I couldn't focus on calling communications.  I mean,

1  if he wasn't complying, I didn't want to leave the
2  agent by himself.
3  Q.   Did you observe the defendant pulling his hands
4  in and out of his pockets?
5  A.   I did.
6  Q.   Was he obeying commands?
7  A.   No.  I mean he would take them out, initially;
8  he would put them right back in.
9  Q.   Do you have any concerns with an individual
10 putting their hands in their pockets during an
11 encounter like this?
12 A.   Yes.
13 Q.   What are those concerns?
14 A.   He could have a weapon on him.
15 Q.   At the time you stood there during this
16 encounter, had you already learned about what had
17 been found inside the house?
18 A.   Correct.
19 Q.   And in your training and experience, is it
20 common for people to come and go from drug houses?
21 A.   Yes.
22 Q.   What do they do when they come and go from drug
23 houses?
24 A.   They are coming to pick up narcotics, drop off
25 narcotics or United States currency.

1  Q.   In your training and experience with people
2  involved in drug trafficking, is it frequent that
3  they have firearms?
4  A.   It is common for them to carry firearms.
5  Q.   The defendant, how would you describe his
6  clothing?  Did it appear normal or bulky or anything
7  like that?
8  A.   I would say baggy.  I personally did not observe
9  any bulges.  My attention was drawn to the larger
10  amount of United States currency.
11  Q.   Was the defendant alone?
12  A.   Yes, he was.
13  Q.   Had you ever met or had any dealings with the
14  defendant prior to this occasion?
15  A.   No.
16  Q.   Now at the time he kept putting his hands in or
17  removing them from his pockets, eventually what did
18  you and Agent Bowman do?
19  A.   I advised him that I was going to pat him down
20  for weapons or search him -- I don't recall my exact
21  wording.  I believe it was pat down.  And at that
22  time David Lewis put his hands in the air and
23  advised that he had a gun.
24  Q.   At the point he said that he had a gun on his
25  person, did anyone draw weapons on him?

1  A.   A DEA agent did step out.  He heard him yell, "I
2  have a gun," and he did point his gun at him, yes.
3  Q.   Prior to that point though had anybody
4  pointed --
5  A.   No.  No one did not.
6  Q.   Had either you or Agent Bowman brandished your
7  weapon?
8  A.   No.  Mine stayed in the holster the entire time,
9  but it was on my right hip.
10  Q.   And were you able to -- ever able to complete
11  your warrant check before this happened?
12  A.   No, I did not.
13  Q.   At the time he said that he had a gun, did
14  safety become the ultimate priority at that point?
15  A.   Yes, it did.
16  Q.   Had anyone searched the defendant prior to the
17  point where he said that he had a firearm?
18  A.   No.
19  Q.   And what at that point did you and Agent Bowman
20  do?
21  A.   We -- when we felt it was safe to do so, we
22  disarmed him, made the gun safe.  He was placed in
23  wrist restraints, and then he was searched incident
24  to arrest.
25  Q.   Was anything else found on his person?

1  A.   Yes.

2  Q.   What would that have been?

3  A.   I believe a cell phone.  I know there was

4  approximately three grams of cocaine located on the

5  subject.  I can't recall the rest.

6  Q.   Did he have a large amount of currency?

7  A.   Yes, a large amount of currency.

8  Q.   How much money are we talking here?

9  A.   I'd have to review the reports again, but I

10 believe it was over $7,000.

11 Q.   Now at the time you found the weapon, was the

12 search still going on inside?

13 A.   Yes, it was.

14 Q.   And was Mr. Liggins still inside?

15 A.   Yes.

16 Q.   Were the children still inside?

17 A.   Yes, they were.

18 Q.   And was Mr. Lewis arrested at that point?

19 A.   Yes, he was in custody.

20 Q.   Was he eventually taken to the public safety

21 building in Danville?

22 A.   Yes, he was.

23      MR. FRERES:  Your Honor, may I approach?

24      THE COURT:  You may.

25 BY MR. FRERES:

1 Q.   I'm handing what you I have marked as

2 Government's Exhibit 3.  I'm going to ask you a

3 couple questions here.

4          Did you following that day attempt to figure

5 out what time Mr. Lewis was booked into the jail?

6 A.   Yes.

7 Q.   And did you contact the jail authorities and did

8 they provide you information?

9 A.   Yes, I did.

10 Q.   And is what you are holding there, Government's

11 Exhibit 3, the results of that inquiry?

12 A.   Yes, sir.

13          MR. FRERES:  Your Honor, I move to do admit

14 Government's Exhibit 3.

15          MS. POLLOCK:  No objection.

16          THE COURT:  Admitted.

17 BY MR. FRERES:

18 Q.   I'm going to put up Government's Exhibit 3 here

19 on ELMO.

20          Can you see that, Agent Benschneider?

21 A.   Yes, sir.

22 Q.   About halfway down the page, is there an entry

23 there for the defendant?

24 A.   Yes.

25 Q.   What time does it show that he was booked into

1  the jail?

2  A.   1345 hours.

3  Q.   I'm sorry, what time?

4  A.   Going in and out.

5  Q.   Let me see if I can unblurry this here.  There

6  you go.

7  A.   1435 hours.

8  Q.   Is that military time?

9  A.   Yes.

10  Q.   What time does that correspond to in civilian

11  time?

12  A.   2:35.

13  Q.   Now would this have been subsequent to his

14  encounter with you and Agent Bowman?

15  A.   Yes.

16  Q.   So he was in jail and being booked in by 2:35

17  that day?

18  A.   Uh-huh.

19  Q.   If there was a later LEADS check, would that

20  have been done while you were encountering him, done

21  on scene?

22  A.   No.

23  Q.   Would it -- is it common to do a LEADS check

24  even when somebody is in custody?

25  A.   I believe that it is part of the booking process

1  for correctional officers.

2  Q.   Does this time roughly correspond to your

3  recollection of when the events occurred at the

4  residence?

5  A.   Yes.

6  Q.   And at 2:35 or thereabouts, just before that,

7  was DEA just searching the scene?

8  A.   Yes.

9  Q.   Was Mr. Liggins also still inside at the time

10  Mr. Lewis was taken away?

11  A.   Yes.

12  Q.   Now, there is also -- you see there for

13  Mr. Liggins, and both Timothy and Terrance Liggins,

14  it looks like there is booking times as well.  Do

15  you see that?

16  A.   Yes.

17  Q.   What is the booking time for Timothy Liggins?

18  A.   Timothy Liggins is 1445 hours which is 2:45.

19  Q.   And how about Terrance Liggins?

20  A.   Terrance is 1610 hours, that would be 4:10.

21  Q.   Did you take part in Mr. Liggins's interview,

22  Terrance Liggins?

23  A.   No, I did not.

24  Q.   Now, do you have experience in -- from your time

25  with VMEG or Tilton PD, I suppose, searching

1  residences?

2  A.   Yes.

3  Q.   Is it a dangerous operation?

4  A.   Yes, it is.

5  Q.   Who is it dangerous for?

6  A.   It is dangerous for the officers inside as well

7  as the residents of that residence.

8  Q.   Do new arrivals present issues?

9  A.   Yes.

10 Q.   What are some of the issues that somebody

11 arriving on scene while a search is going on

12 presents?

13 A.   Hinders the investigation.  We don't know the

14 intentions of the individual coming to that

15 residence, don't know if there are any weapons or if

16 they are trying to take or bring more evidence.

17 Q.   Have you ever conducted surveillance on a drug

18 house?

19 A.   Yes, I have.

20 Q.   Do people often come and go from drug houses?

21 A.   Yes, they do.

22 Q.   And what are they doing when they are coming and

23 going from drug houses?

24 A.   They could be buying narcotics, dropping off

25 narcotics, dropping off money, United States

1  currency.

2  Q.   And as you encountered Mr. Lewis that day, they

3  had already found a kilo of coke inside the house,

4  correct?

5  A.   Yes.

6  Q.   Did that color your encounter with Mr. Lewis

7  that day, how you had dealt with him?

8  A.   Yes.

9  Q.   Is it important when searching residents to

10 maintain a security perimeter?

11 A.   Yes, it is.

12 Q.   Could you let new arrivals just enter the house?

13 A.   No.

14 Q.   If you were to just tell them to go away, would

15 they still present a danger?

16 A.   Yes.

17          MR. FRERES:  I have no further questions,

18 Your Honor.

19          THE COURT:  Cross.

20                   CROSS-EXAMINATION

21 BY MS. POLLOCK:

22 Q.   Good morning.

23 A.   Good morning.

24 Q.   You testified it was very cold that day,

25 correct?

1  A.   Yes.

2        MR. FRERES:  Your Honor, I presented in a

3  footnote in my reply that the temperature was 29

4  degrees and very windy that day.  Would the Court

5  take judicial notice of that please?

6        THE COURT:  Any objection?

7        MR. FRERES:  No objection.

8        THE COURT:  Noted.

9  BY MS. POLLOCK:

10 Q.   On that day you and Agent Bowman let a lot of

11 other people go away from the residence, correct?

12 A.   After running their names, yes.

13 Q.   All right.  And those people were not considered

14 a danger; they just turned around and left, correct?

15 A.   Yes.

16 Q.   You were aware that Terrance Liggins was

17 cooperative with the DEA?

18 A.   Yes.

19 Q.   You were aware that he let them in and gave them

20 consent to search the residence?

21 A.   Yes.

22 Q.   You were aware that while standing in the house

23 that everyone who had been in the residence were all

24 seated there and were controlled at that point,

25 correct?

1  A.   Yes.

2  Q.   And they were also being cooperative?

3  A.   Yes.

4  Q.   Now, were any other searches executed as a

5  result of this search?

6  A.   None that I'm aware of.

7  Q.   So you're not aware of any other residence, that

8  another individual inside the residence also gave

9  consent to search his residence?

10  A.   Correct, I'm not aware of that.

11  Q.   You stated a couple of things that I wanted to

12  talk to you about here.

13       You wrote reports as a result of your

14  investigation in this matter, correct?

15  A.   Yes, I did.

16  Q.   Tell me how you write those reports.  Do you

17  draft it in Word and then put a heading on it?  How

18  does that work for you?

19  A.   While I was working at VMEG, there would be

20  forms already with a heading, and I would write my

21  report.

22  Q.   All right.  May I have -- thank you.

23       I'm going to show you a copy of this report.

24  A.   Uh-huh.

25  Q.   Can you see that right there?

1  A.    Yes.

2  Q.    It says VMEG probable cause arrest?

3  A.    Uh-huh.

4  Q.    And then there is this one, it's a VMEG incident

5  report.

6          Do you see those two?

7  A.    Correct.

8  Q.    What is the difference between those two?

9  A.    The probable cause is -- you do beforehand, that

10  is to establish that there is probable cause for

11  their arrest.  At a later date we could finish the

12  entire report and resubmit it.  Sometimes they are

13  the exact same; sometimes they are not.

14  Q.    Because in your probable cause report, there was

15  no mention of any currency that was seen in David

16  Lewis' jacket, correct?

17  A.    That is correct.

18  Q.    And there is also no mention of any currency

19  seen in his jacket in your actual incident report,

20  isn't that correct?

21  A.    It would have been noted in the evidence report.

22  Q.    It would have been noted after he was searched

23  and his items were confiscated, but if you are

24  looking to establish a reason to search a person,

25  you would want to put that in your probable cause

1  report, wouldn't you?

2  A.   Yes.

3  Q.   And you didn't note that in either of these

4  locations, correct?

5  A.   Correct.

6  Q.   So the first time that anyone heard that you saw

7  currency inside of David Lewis's jacket is in fact

8  today, right now, isn't that right?

9  A.   Yes.

10  Q.   And you testified at the preliminary hearing in

11  his state case, correct?

12  A.   I did.

13  Q.   Didn't mention it then either, did you?

14  A.   I don't recall my exact testimony.

15  Q.   Additionally, and, you know, in your incident

16  report there is a new paragraph that was added, not

17  present in the probable cause report, that says "it

18  should be noted that a kilo of cocaine was seized

19  from that address and the kilogram was later

20  observed to be broken into quarter increments."

21          That is not what the DEA task force officer

22  testified to earlier when you were present in this

23  courtroom, isn't that right?  He said two bags?

24  A.   Okay.  I never saw the cocaine.  I was going off

25  of what another agent stated.

1   Q.   So, you didn't actually have knowledge of that

2   when you wrote it in your report?

3   A.   That was knowledge from another agent.

4   Q.   But you did -- how was that knowledge wrong if

5   the DEA task force officer was telling the truth,

6   right?

7   A.   Yes.

8   Q.   You also noted that a quarter kilo cost

9   approximately 8 to $10,000; that was not in your

10  probable cause report either, was it?

11  A.   Umm.

12  Q.   I can show you if you like.

13  A.   Yes, please.

14       MS. POLLOCK:  May I approach?

15       THE COURT:  You may.

16  BY MS. POLLOCK:

17  Q.   Has your recollection been refreshed with

18  regards to that?

19  A.   Yes, ma'am.

20  Q.   So as I stated, your probable cause report made

21  no mention of money or the value of cocaine that

22  made it into your incident report, correct?

23  A.   You're correct.

24  Q.   Now David Lewis did have some cash on him.  What

25  did he say about where that cash came from?

1  A.   I honestly don't remember.

2  Q.   Did you even ask him?

3  A.   We asked him to write his statement in reference

4  to the incident and he didn't want to provide his

5  statement, so --

6  Q.   So you had no idea where the money came from?

7  A.   Correct.

8  Q.   And you had no idea where it was going?

9  A.   Correct.

10  Q.   In fact, you have no information whatsoever that

11  David Lewis was approaching that house to purchase

12  cocaine from Terrance Liggins, correct?

13  A.   I never said he was.

14  Q.   In fact, Terrance Liggins had given a voluntary

15  statement indicating that he was holding the cocaine

16  for a Mexican drug dealer from Chicago, right?

17  A.   After reviewing the DEA reports, yes.

18  Q.   Well, I mean you knew a kilo of cocaine had been

19  discovered and you were in the house next to the

20  people with the DEA agents, correct?

21  A.   Yes, ma'am.

22  Q.   Another thing from your report, you stated that

23  on direct that Mr. Lewis appeared to be very nervous

24  and had his hands in and out of his pockets; you

25  recall that, right?

1  A.   Yes.

2  Q.   Do you recall writing in your report that you

3  instructed him immediately you're going to pat him

4  down and ensure that he had nothing illegal on his

5  person; do you recall that?

6  A.   I do recall telling him I was going to pat him

7  down.

8  Q.   What is your understanding of what is required

9  in order for a police officer to initiate a pat down

10  of a person?

11  A.   Reasonable suspicion to believe that there could

12  be a weapon on that person.

13  Q.   So a random search just to make sure there is

14  nothing illegal that would not satisfy that

15  standard, would it?

16  A.   With him continuing to put his hands in his

17  pockets, we believe he might have had a weapon,

18  that's why we advised him that we were going to pat

19  him down.

20  Q.   You didn't say you were looking for a weapon,

21  you said you were looking for something illegal,

22  correct?

23  A.   Firearms are illegal.

24  Q.   Then you told him, you're just going to write

25  down his name and date of birth and let him leave;

1  do you recall that?

2  A.   Yes.

3  Q.   At that point you were flanking Mr. Lewis with

4  Agent Bowman, correct?

5  A.   I stood above him on the steps.  I'm not sure

6  where Agent Bowman was standing.  I believe --

7  Q.   You were sitting here when he testified, right?

8  A.   I was.

9  Q.   You heard him say that he was on the other side

10  of the defendant between him and the sidewalk,

11  correct?

12  A.   I did hear that, yes.

13  Q.   And that was from the very first instant that

14  you encountered the defendant, right?

15  A.   Yes.

16  Q.   So you were flanking him, one officer on each

17  side, preventing him from leaving, isn't that true?

18  A.   Yes.

19  Q.   Now he was cooperative with you anyway, was he

20  not?

21  A.   Yes, he was.

22  Q.   And he gave you his ID?

23  A.   Yes.

24  Q.   He said, "Can I just leave?"  Right?

25  A.   Correct.

1  Q.   And you said, "No."  Right?

2  A.   We didn't finish running the local or warrant

3  check on him.

4  Q.   The warrant check that there is no record of.

5  Interesting.  Let's get to that.

6        So, your experience as a police officer,

7  with LEADS, isn't it correct, that when a name is

8  run through LEADS, there is a record of that search

9  being conducted?

10  A.   Correct.

11  Q.   And if there is a search conducted, even if

12  there is no results, it would simply read "no

13  results," correct?

14  A.   Yes, ma'am.

15  Q.   In fact, the other individuals who you

16  questioned, you heard Agent Bowman testify that

17  there would be no record of that, but you testified

18  correctly there would be a record of that, right?

19  A.   That is correct.  On scene he was not ran due to

20  the situation.

21  Q.   So you called your -- you said your

22  communications division?

23  A.   Yes.

24  Q.   And you gave them his name and date of birth?

25  A.   I did not call yet.  I was in the process of

1  calling.  David Lewis kept on putting his hands in

2  his pockets.  I didn't want to leave Agent Bowman

3  with him by hisself, not knowing if he had anything

4  on him; didn't know his intentions.

5  Q.   Now you testified on direct that it was Agent

6  Bowman who told him that he should stop putting his

7  hands in his pockets?

8  A.   I believe we both did.

9  Q.   So you were simultaneously speaking to him

10  saying the same thing?

11  A.   Yes.

12  Q.   Who is the DEA agent that came out in the middle

13  of the search?

14  A.   It wasn't in the middle.

15  Q.   When was it?

16  A.   It was after he advised that he had a gun.  So

17  there would have been an agent standing at the door

18  at that time and he must --

19  Q.   So your testimony is that he just threw his

20  hands up in the air and said I had a gun?

21  A.   After I advised him that I was going to pat him

22  down, he stated -- at that time he stated he had a

23  gun.

24  Q.   And your testimony is not that someone reached

25  in his pocket first, found a small baggie of

1  cocaine, and then decided to pat him down?

2  A.   Correct, that's not how it happened.

3       MS. POLLOCK:  Nothing further at this time.

4                REDIRECT EXAMINATION

5  BY MR. FRERES:

6  Q.   Officer Benschneider, as you are conducting a

7  search and people are being cooperative, can that

8  situation change?

9  A.   Yes.

10 Q.   Would new arrivals -- they had the possibility

11 of emboldening people who might otherwise have been

12 uncooperative?

13 A.   Correct.

14 Q.   Now, you were asked about -- several questions

15 about the probable cause report versus your later

16 report.  At the time you wrote your reports, what

17 was the most compelling thing that you were

18 concerned about?

19 A.   The subject having the gun.

20 Q.   The firearm being the most compelling thing at

21 that point?

22 A.   Correct.

23 Q.   He wasn't arrested for having money on his

24 person, correct?

25 A.   Correct, he was not.

1  Q.   Now does VMEG or DEA split responsibility for

2  the evidence seizure?

3  A.   Agent Bowman was the agent taking care of the

4  evidence.  I don't know for sure.

5  Q.   So you're not aware if it was actually DEA who

6  seized the cocaine.  Did VMEG ever have custody of

7  the cocaine to the best of your knowledge?  The

8  cocaine from Mr. Liggins residence, I apologize.

9  A.   Mr. Liggins's residence, that was the DEA.  They

10 took the evidence of that.  The evidence obtained

11 from David Lewis, that would have been our seizure.

12 Q.   Now, you were asked several questions too about

13 -- the implication was that you just told him that

14 you were going to pat him down from the outset of

15 the encounter; is that correct?

16 A.   The reason why we patted him down was because he

17 had his hands in his pockets.

18 Q.   In other words, there were several things during

19 encounter that happened before you told him that you

20 were going to pat him down?

21 A.   Correct, it wasn't right away.

22 Q.   It's not correct and not accurate in any way,

23 shape, or form from the very outset you said, "We

24 are just going to pat you down"?

25 A.   Correct.

1  Q.  Now when you told him that you were going to

2  take his name and his date of birth and let him

3  leave, was that subject to anything?

4  A.  That was to run a warrant check.

5  Q.  And when you talk about a warrant check, is

6  there a difference between running a full LEADS

7  check and just calling your local folks?

8  A.  We are calling the same place.  So there is a

9  warrant list that is just for Vermilion County only

10 and a warrant check is the entire United States.

11 Q.  At the time were you just checking the local

12 data base?

13 A.  Correct.

14 Q.  Did you ever complete that warrant check on

15 Mr. Lewis before he said that he had a gun?

16 A.  Not on scene, no.

17 Q.  You were asked if the defendant was cooperative.

18 Was he entirely cooperative with police commands?

19 A.  No.  He did not listen to our orders.

20 Q.  Was he polite?

21 A.  Yes.

22 Q.  So would it be fair to say that polite and

23 cooperative, we are using those terms interchanged,

24 but they are two different things?

25 A.  Correct.

1          MR. FRERES:  No further question.

2          MS. POLLOCK:  No questions.

3          THE COURT:  I have a few questions.

4          You indicated that you and Special Agent

5 Bowman approached two vehicles.

6          One, the first containing two individuals;

7 and the second containing one individual, and ran

8 warrant checks on them before allowing them to

9 leave; is that correct?

10          THE WITNESS:  Yes, ma'am.

11          THE COURT:  Where were those vehicles

12 located?

13          THE WITNESS:  One was parked in the

14 driveway, and one was parked outside the residence,

15 out front of the street in front of the residence.

16          THE COURT:  What side of the street is the

17 house on:  north, south, east, west?

18          THE WITNESS:  It would have been on the east

19 side of the road.

20          THE COURT:  And so what side of the road --

21 what lane in the road was the car parked?

22 Immediately in front or on the other side?

23          THE WITNESS:  Immediately in front.

24          THE COURT:  And when you approached the

25 vehicle that was in the driveway, were they free to

1  leave before you did the ID check?

2       THE WITNESS:  No, they were not.

3       THE COURT:  And what about the vehicle that

4  was out on the public street?

5       THE WITNESS:  No, they were not free to

6  leave.

7       THE COURT:  Okay.  And why would that be?

8       THE WITNESS:  We were asked to identify the

9  subjects coming and going.

10      THE COURT:  Did you ever see the individuals

11  in the car that were parked out in front of the --

12  in the street leave that vehicle or enter that

13  vehicle?

14      THE WITNESS:  We observed the vehicles pull

15  up and that's when we encountered them.

16      THE COURT:  So the vehicles arrived once you

17  were already on the scene?

18      THE WITNESS:  Correct.

19      THE COURT:  And when you approached the

20  defendant by exiting the house, where was he

21  physically?

22      THE WITNESS:  He would have been either

23  right before the first step of the residence or he

24  would, I believe, right at the first step of the

25  residence.

1      THE COURT:  And he would not be free to
2   leave at that point until you conducted your warrant
3   search; is that correct?
4      THE WITNESS:  That's correct.
5      THE COURT:  And you testified that if they
6   had left, if you just allowed people like the
7   defendant who had approached the house to go away,
8   they still would present a danger; what do you mean
9   by that?
10      THE WITNESS:  I mean they still could
11   have -- they could have -- I let other people know
12   that police were at the residence.
13      THE COURT:  Well, you let the other people
14   in the vehicles leave, right?
15      THE WITNESS:  Right.
16      THE COURT:  Could they have posed that same
17   risk?
18      THE WITNESS:  Yes, they could have.
19      THE COURT:  So why is that unique to the
20   defendant?
21      THE WITNESS:  Well, we were in the process
22   of doing the same thing, but the subject -- it had
23   changed when the subject was putting his hands in
24   his pockets.
25      THE COURT:  But the question wasn't specific

to the defendant.  If I recall the question posed by
the prosecutor was, If a person approaches a house
and asks to leave, prior to you conducting your
warrant search, would they still present a danger?

So other than what you've already described
about disclosing the fact that a search was
happening, what other danger could such an
individual pose?

THE WITNESS:  I'm sorry, could you ask that
again?

THE COURT:  You answered that somebody that
who is allowed to go away from the premises prior to
a warrant check coming back cleared would still
present a danger.

THE WITNESS:  Uh-huh.

THE COURT:  You told me that that meant to
you that they could disclose the fact that a search
was occurring.

THE WITNESS:  Uh-huh.

THE COURT:  Any other danger they could he
present?

THE WITNESS:  They could potentially come
back with a weapon of some sort.

THE COURT:  And so you would be satisfied if
the warrant check had cleared that that would not be

1  a risk?

2          THE WITNESS:  At that point we technically

3  didn't have any other reason to detain them.

4          THE COURT:  Did you or sergeant -- or sorry

5  -- Special Agent Bowman ever ask the defendant why

6  he was at the residence?

7          THE WITNESS:  Yes, I believe so.

8          THE COURT:  And did he respond?

9          THE WITNESS:  I don't know if it is notated

10  in my report or Special Agent Bowman -- I think he

11  said he was there to get a cigarette maybe.

12          THE COURT:  Do you have an actual

13  recollection of what happened?

14          THE WITNESS:  No.

15          THE COURT:  Or are you just referring to the

16  report?

17          THE WITNESS:  Referring to the report.

18          THE COURT:  And did you testify at the

19  preliminary hearing in state court?

20          THE WITNESS:  Yes, I did.

21          THE COURT:  Okay.  Did you mention the cash

22  that you observed during that testimony?

23          THE WITNESS:  No, I did not.

24          THE COURT:  And at the time of the actual

25  encounter at the residence, you testified that you

1  saw kind of in plain sight a plastic bag with a

2  large amount of currency in the defendant's open

3  jacket inside pocket?

4          THE WITNESS:  Yes, I did.

5          THE COURT:  At any time on the scene did you

6  tell Special Agent Bowman that you had seen that?

7          THE WITNESS:  I don't recall if I told him.

8  I think that I did but I don't know if he heard me

9  or not.

10          THE COURT:  Why didn't you put that in your

11  report or testify at the preliminary hearing about

12  the large amount of cash that you observed?

13          THE WITNESS:  I was more worried about the

14  gun at that point.

15          THE COURT:  The gun that you hadn't

16  discovered yet?

17          THE WITNESS:  Correct.

18          THE COURT:  Okay.  Any questions based on

19  the Court's questions?

20          MR. FRERES:  Yes, Your Honor.

21              FURTHER REDIRECT EXAMINATION

22  BY MR. FRERES:

23  Q.   Just to clarify that last question.

24          At the time that you wrote your report, you

25  were more concerned about the gun?

1  A.   Yes, I was.

2        MR. FRERES:  I think, Judge Darrow, you were

3  asking at the time about the incident.

4  BY MR. FRERES:

5  Q.   Was this all happening quickly?

6  A.   Very quickly.

7  Q.   And at the time you were on the phone with the

8  authorities, is that the point where the defendant

9  said he had a gun?

10  A.   I wasn't even on the phone with him yet.  I was

11  in the process of either writing down the name or

12  trying to contact communications to run the warrant

13  check and then that's when he was putting his hands

14  in his pocket.

15  Q.   And at that point in time do pretty much any --

16  all other concerns go out the window, if somebody

17  admitted they are presenting a danger?

18  A.   Yes.

19  Q.   And somebody putting their hands in their

20  pocket, why is that a concern to you?

21  A.   They could be concealing a weapon.

22  Q.   Now you also -- you were asked about the time

23  that the vehicles arrived in the encounters you had.

24  Do you recall that?

25  A.   Yes.

1  Q.   Had you already learned that drugs had been

2  recovered from inside this residence?

3  A.   Yes.

4  Q.   And a firearm had been recovered inside as well?

5  A.   Yes.

6  Q.   Were your concerned that these people were

7  potentially coming to buy drugs?

8  A.   Potentially, yes.

9  Q.   If the warrant checks were cleared though, would

10 you have any other basis to hold at that point?

11 A.   No, we did not.

12 Q.   Just because the warrant checks were clear, does

13 not mean that they were not a danger, correct?

14 A.   Yes.

15 Q.   They are now aware that a search is going on,

16 correct?

17 A.   They are.

18 Q.   If they were there to buy drugs, could they go

19 get a firearm?

20 A.   They could.

21 Q.   Could they go get other people to come back?

22 A.   Yes.

23 Q.   In other words, the secrecy or the attempt to do

24 whatever it is the law enforcement is doing is now

25 sort of knowledge to individuals who are there,

1  correct?

2  A.   Correct.

3  Q.   Is that why you continued to maintain a security

4  perimeter on the house?

5  A.   Yes.

6  Q.   You were vigilant the entire time?

7  A.   Yes.

8  Q.   And that's why you couldn't also let the

9  defendant inside the residence for that same reason,

10  correct?

11  A.   Yes.

12  Q.   Could he have been associated with the people

13  who you already cleared?

14  A.   Yes.

15  Q.   You didn't know?

16  A.   We did not know, no.

17  Q.   As you stood there, the time when you didn't

18  know, you did know that there were civilians inside

19  the house?

20  A.   Yes.

21  Q.   And it was a drug house?

22  A.   Yes.

23  Q.   And there was a loaded gun recovered inside?

24  A.   Yes.

25        MR. FRERES:  I don't have anything else,

1 Your Honor.

2        THE COURT:  Okay.  Just a follow-up on two

3 points there.

4        So what is the point or purpose of

5 conducting the warrant checks on individuals who are

6 within the perimeter of the search if that does not

7 reduce any concerns you have about the threat they

8 might pose?

9        THE WITNESS:  Identifying the subjects.

10 Maybe we didn't have any reason to detain them then,

11 but then maybe they're part of the DEA investigation

12 that we are not aware of.

13        THE COURT:  Why would a warrant search

14 reveal that?

15        THE WITNESS:  It would have -- well, to my

16 knowledge, I thought it would be recorded through

17 dispatch.

18        THE COURT:  Okay.  When you observed the

19 cash that was -- if I understand the order of

20 things, that was prior to you initiating this

21 intended call.

22        THE WITNESS:  Correct.  So at this time this

23 is the initial contact.

24        THE COURT:  Okay.  And then after observing

25 the cash in his pocket, your next action was to

1  attempt to conduct the warrant search through

2  dispatch?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  And then after the failure to

5  comply with removing his hands from his pockets on

6  multiple occasions is when you told him you were

7  going to pat him down?

8          THE WITNESS:  Yes.

9          THE COURT:  So the reason that you decided

10 to pat him down was because of his movements with

11 his hands in his pockets?

12         THE WITNESS:  Correct.

13         THE COURT:  And it wasn't because you had

14 observed the cash?

15         THE WITNESS:  That's correct.

16         THE COURT:  Anything further based on the

17 Court's questions?

18         MS. POLLOCK:  I have one follow-up, Your

19 Honor.

20         THE COURT:  Yes.

21         MS. POLLOCK:  Actually the Court's previous

22 round of questions.

23         THE COURT:  Absolutely.  If there are any

24 questions based on the Court's questions, I will

25 give you leave.

1           MS. POLLOCK:  Thank you, Your Honor.

2                   RECROSS-EXAMINATION

3   BY MS. POLLOCK:

4   Q.   We keep throwing this term around "drug house."

5   What is a drug house to you?

6   A.   A house involved in narcotics.

7   Q.   So, is it a place where narcotics are

8   distributed?

9   A.   It could be distributed.  It could be people

10  coming to use them at the residence.

11  Q.   So anywhere where narcotics are found is a drug

12  house?

13  A.   I mean not per se.

14  Q.   Well, help me out because I'm confused.

15  A.   If we are called to assist a DEA, which is a

16  drug enforcement group, they advise there is

17  narcotics found.  I mean, I would consider the house

18  being a drug house.

19  Q.   All right.  You had no information that Terrance

20  Liggins was selling drugs, correct?

21  A.   Me, personally, no.

22  Q.   No knowledge of the DEA thought that he was

23  selling drugs, correct?

24  A.   Correct.

25  Q.   And you had no knowledge that anybody had

1  purchased drugs at that house, correct?

2  A.   Yes.

3  Q.   And you had no knowledge whether or not anybody

4  inside the house possessed anything of the

5  indicative of cocaine, correct?

6  A.   Correct.

7  Q.   And you knew the DEA's investigation had led

8  them there from Chicago, right?

9  A.   That's correct.

10  Q.   Meaning no local suspects, correct?

11  A.   Yes.

12       MS. POLLOCK:  Thank you.  Nothing further.

13       THE COURT:  Okay.

14       MR. FRERES:  Just one, Your Honor.

15       THE COURT:  All right.

16            FURTHER REDIRECT EXAMINATION

17  BY MR. FRERES:

18  Q.   Officer Benschneider, based on your training and

19  experience, is a kilogram of cocaine a distribution

20  amount of cocaine?

21  A.   Yes.

22  Q.   In 2017 in Danville, what is the approximate

23  street value of that?

24  A.   I honestly don't know.  We don't really deal

25  with quantities that large.

1  Q.   Several thousand dollars?

2        THE COURT:  You have to lay a foundation if

3  you are going to ask him for him to give the

4  opinion.

5        MR. FRERES:  Fair enough.

6  BY MR. FRERES:

7  Q.   Have you been involved in any controlled

8  purchases of cocaine?

9  A.   Yes.

10 Q.   A gram at a time?

11 A.   Approximately a hundred dollars.

12 Q.   So, a kilogram is a thousand grams, correct?

13 A.   Correct.

14 Q.   And you would expect that to be roughly the

15 same, as least as your one gram to a hundred dollar

16 gram, something akin to that, several thousand

17 dollars?

18 A.   Correct.

19 Q.   And at the time of this encounter, you were

20 aware that this several thousand dollars worth of

21 drugs were recovered inside the house; is that

22 correct?

23 A.   That's correct.

24       MR. FRERES:  Thank you.  No further

25 questions.

1          THE COURT:  You may step down.

2          Any further evidence?

3          MR. FRERES:  No, Your Honor.

4          MS. POLLOCK:  One moment, Your Honor.

5          THE COURT:  You may.

6          MS. POLLOCK:  No evidence in addition, Your

7  Honor.

8          THE COURT:  Okay.  Thank you.

9          I will entertain argument at this time.

10          MS. POLLOCK:  Thank you, Your Honor.

11          What we have here is a situation where there

12  was no reason to stop David Lewis and no reason to

13  search David Lewis.

14          I take issue factually with the

15  representation that warrant checks were run on these

16  people.  I know that's what the officers testified

17  to.  There is no evidence of it.  There is no record

18  of it.  It's not in any of their reports.  None of

19  their names are recorded.  We FOI'd, subpoenaed, and

20  did everything we could to get every piece of paper

21  associated with this case; it has never come up.

22  All we can see is that his LEADS report was run

23  after he was arrested.  That happened while he was

24  already in custody at the jail after he refused to

25  give a statement.

1        So, factually, I don't believe that there

2    last been any evidence, other than testimony, which

3    I believe is questionable, to say that these warrant

4    checks were run in the first instance.  That

5    aside --

6        THE COURT:  When you say that, did you

7    only -- like the subpoena only requests LEADS checks

8    for the defendant.  Did you --

9        MS. POLLOCK:  It doesn't though.  The

10   subpoena requests LEADS checks run by any VMEG

11   agent, Benschneider and Bowman, on that date.

12       THE COURT:  Thank you.

13       MS. POLLOCK:  Nothing came back.

14       So with regards to whether or not this was

15   some local system or what-have-you, I question,

16   frankly, whether they should have been detaining

17   people in the first instance to run checks on them.

18       This case is very distinguishable from cases

19   that were cited from the government in the response

20   where people have approached at the beginning of a

21   search within the perimeter.  The perimeter in this

22   case was the house.  The house was secure.  The

23   testimony from the most credible officer present

24   today, which is the task force officer, indicated

25   that everything was completely calm, cooperative.

1   Liggins within minutes signed the consent, led them

2   directly to the basement, showed them the cocaine,

3   sat on the couch and cooperated.

4          I know that I wasn't able to elicit it

5   today, but there was actually another consent search

6   performed on his brother's place at a later time.

7          So everybody in the house was cooperative.

8   If there was any danger whatsoever, why would they

9   have kids there?  Why would they just let the kids

10  just hang out in the living room if this was a

11  problem?  And you have other people approaching the

12  residence and being told, "Yeah, get lost.  There is

13  a search going on here.  Go away."

14         And David Lewis walked up to get a light,

15  doesn't even make it to the porch, and all of a

16  sudden he is flanked by two officers and that was

17  admitted to.

18         THE COURT:  There is no evidence that he was

19  going up there for a particular purpose.

20         MS. POLLOCK:  Well, we didn't hear any

21  evidence about what it was, but I believe that

22  Officer Benschneider testified that upon review of

23  his report, it had to do with the cigarette; that

24  that would be our position, that he was going up to

25  get a light for the cigarette.  That was in the

1  report.  I don't think he remembered it, but the

2  reporter is as such.

3          If the Court would like us to supplement, we

4  can do that by entering the report into evidence but

5  that's what it was.

6          So, he is walking up to the porch.

7  Everything -- and the timing here has been -- just

8  to flush the timeline just a little bit.  At 8:30 in

9  the morning the DEA starts surveilling this.  They

10  drive down to Danville.  They follow him there.  At

11  12:30 he arrives.  At 12:49 he is out of the

12  house --

13          THE COURT:  Can you rely on things that are

14  in evidence.

15          MS. POLLOCK:  The TFO officer testified

16  to --

17          THE COURT:  I don't think he gave such

18  particulars about the timeline at the beginning, did

19  he?

20          MS. POLLOCK:  Well, I'm sorry about the

21  time.

22          But he followed the guy down from Chicago.

23  Got to Danville.  And within an hour was knocking on

24  the door at Liggins's residence and asking for

25  consent to search, and that was at 2:00.

1          So we don't know exactly what time David
2    Lewis showed up at the house.  But we know from the
3    task force officer's testimony that they were done
4    when he found out that David Lewis had come and gone
5    and Liggins was in the interview room having waived
6    Miranda at 3:00 p.m.  So the entire search wrapped
7    up, you can assume, 45 to 55 minutes because the
8    public safety building is not that far away from the
9    home as testified to.
10         So sometime between 2:10 and 2:40 is when
11   David Lewis must have approached them and he was in
12   custody at the PSP, I think the testimony was, by
13   2:35 or 2:40.  I can't recall exactly.
14         THE COURT:  2:35.
15         MS. POLLOCK:  So the whole thing was wrapped
16   up by then.  Liggins had given them the kilo.  He
17   agreed to cooperate.  He was there 15 minutes after
18   Mr. Lewis was.  This was not a lengthy search
19   operation.  It was done very quickly.
20         THE COURT:  Why does it matter what stage
21   the search was in if the searching agents still had
22   not departed the residence?
23         MS. POLLOCK:  It matters because a lot of
24   case law details that the part of the search where
25   the agents really need to be concerned about safety,

where danger is a thing, is at the beginning when
they don't know what they are looking at yet, when
they are setting up a perimeter, when they are
knocking on the door and they don't know what they
are going to find.  It is halfway through or close
to the end of a search when everything is already
wrapped up, the stuff has been obtained, people have
been cooperative, everything was calm.  There is no
antagonism whatsoever during this entire situation,
and that includes with Mr. David Lewis who was very
polite.  I know we have had a difference between
being cooperative and having your hands in your
pockets on a freezing cold day in February, but that
testimony I guess stands.

       But, regardless, there is no danger at this
point and the purpose of a pat down search is to
find out if somebody is dangerous, to see if they
are going to be a threat to officer safety, and they
are not.  David Lewis was not.  And the officers had
no reason to believe that he was.  He approached and
said looking for a light.  They flanked him
immediately and they start developing a reason to
search him.  And it's not real.  You can see that
from the reports, because all of a sudden we are
hearing things today -- and there is things in later

1  reports that were drafted weeks later -- all of a

2  sudden there are magic bulges in his pocket.  And

3  all of a sudden, for the first time today, there is

4  currency that we haven't heard of before.

5          If you look at the actual report of the day

6  it was written, which Agent Benschneider --

7          THE COURT:  The actual report is not in

8  evidence.

9          MS. POLLOCK:  Right, but the testimony is.

10 And Agent Benschneider testified to the fact that

11 his initial report, all it said was "He walked up to

12 the house, and I said, 'I'm going to pat you down

13 and take your name.'"  That's it.  Those are the

14 facts that existed on the date.  The other facts

15 were later added and were never in any of those

16 originals.

17         THE COURT:  You asked a question of the case

18 agent about whether or not cocaine had been removed

19 from the pocket at a certain point.  What was the

20 basis for that question?

21         MS. POLLOCK:  It's in his report.

22         THE COURT:  So the standard that I must

23 apply when analyzing whether or not reasonable

24 suspicion existed to support a pat down, is that

25 objective or subjective?

1     MS. POLLOCK:  That is objective, Your Honor.

2     THE COURT:  So even though the question that

3 I posed to the case agent about seeing -- if I

4 credit it -- seeing a large amount of currency for

5 somebody who shows up at a residence under these

6 circumstances and the knowledge that the VMEG

7 officers had, is that something relevant to my

8 analysis even if this particular agent did not rely

9 on that?

10     MS. POLLOCK:  Well, I think so.  If you are

11 getting to the collective knowledge doctrine, are

12 each of them imputed with each other's knowledge at

13 the time --

14     THE COURT:  No, and I'm sorry.  It was not a

15 very artfully worded question.  So the agent said

16 that he didn't -- he wasn't going to -- he didn't

17 base reasonable suspicion in any way before

18 conducting the pat down or announcing the pat down

19 because he had seen this large amount of currency.

20 One might argue, maybe the government will, that it

21 is an objective standard, and a reasonable officer

22 under those circumstances, who sees an individual

23 approach the residence and in plain sight sees a

24 large amount of currency, knowing the amount of

25 drugs and what was located just during the search,

could possibly support reasonable suspicion.

MS. POLLOCK:  I don't think that in and of itself would be reasonable suspicion.  I think any fact is relevant to the Court's analysis in the totality of the circumstances as to what is reasonable suspicion.

So, yes, the Court could take that into account if the Court credits that being correct, which I submit that you should not because of all of the reasons previously stated: it is not in any report; this is the first that we ever heard of it today.

But, regardless, if the Court were to credit that, it could be one factor to consider, but then we have -- the officers did not ask him about the money.  They didn't ask him why -- why he was there, he said to get a cigarette.  They didn't ask Terrance Liggins about David Lewis.  David Lewis never came up in the investigation and they had never met him or known him before, and they had already let other people go; one of them pulled into the driveway while the search was being conducted.

So the totality of the circumstances indicate that there is no more reasonable suspicion for David Lewis than there is for any of these other

1  individuals.

2        THE COURT:  Well, they let them go after

3  detaining them for a warrant.

4        MS. POLLOCK:  Allegedly.  A warrant check of

5  which there is no record and which we are relying on

6  testimony which is inherently and internally

7  inconsistent with other things previously stated by

8  the officers.

9        But assume that -- yes, assume that warrant

10 check was run, which we do not agree with because

11 we've tried to find any evidence of it and there is

12 none that exists, and the officers admitted that

13 when you run a check, any check, there is no record

14 of that check.  It would say "no results," and there

15 is no record of that ever being conducted.

16        So what it looks like is if you read the

17 initial report that Agent Benschneider testified to

18 on cross-examination about what occurred, that is

19 the closest to what occurred that we have.  And then

20 as the time passes, we get more and more facts added

21 in by Special Agent Bowman and by subsequent reports

22 and subsequent testimony, none of when was ever

23 elicited previously.

24        So the reasonable suspicion that existed at

25 the time, if we look at that, the closest thing we

133

have to it, which is the original report, is that
David Lewis walked up to the house to get a smoke or
a light and stood there and they flanked him
immediately upon him walking up.  That is the
evidence.  And then immediately started search
procedures at that point.  And there was no
reason -- he asked if he could leave and they said
no.  He was detained at that point without
reasonable suspicion.

        THE COURT:  Remind me of the testimony,
since that's the only evidence I have, of what was
in that original report.  Did it include -- in
either of the agents's report, did it include the
repetitive pocket?

        MS. POLLOCK:  It said, "hands in pockets";
it did.

        THE COURT:  Just hands in pockets?

        MS. POLLOCK:  I believe so, yes.

        THE COURT:  I guess a more refined question
would be, did it include anything about repeated
noncompliance?

        MS. POLLOCK:  I believe it said that he
should remove his hands from his pocket on multiple
occasions.

        THE COURT:  Okay.  So that's part of the

1  reasonable suspicion analysis available to them at

2  the time.

3        MS. POLLOCK:  It is.  But remember he is

4  being totally cooperative and compliant.  It is

5  29 degrees outside and windy.  He gives them his ID

6  voluntarily out of pocket.  He is carrying a

7  Styrofoam cup in is hand, which he puts down to go

8  retrieve the identification.  And he has his hands

9  in his pockets because he is cold.  That is a

10 reasonable inference.  And the case law exists says

11 the mere nervous acting, it is just not sufficient

12 on its own; you have to have something else to give

13 the police that level of suspicion to start patting

14 people down people for weapons.

15       THE COURT:  So are you challenging the

16 police's action at two different stages?  First that

17 they were not justified because they had no

18 reasonable suspicion to even flank him and detain

19 him in the first instance; and then second, that

20 they weren't justified to conduct the pat down?

21       MS. POLLOCK:  That's correct.

22       THE COURT:  So when they announce the pat

23 down, is your theory that that was effectively an

24 unjustified seizure?

25       MS. POLLOCK:  Yes.

1          THE COURT:  Okay.  What about his statement

2    in response to that, how does that enter into the

3    analysis?

4          MS. POLLOCK:  Well, that would be excluded

5    as fruit of the poisonous tree since he was

6    unlawfully detained at the time and he should never

7    have been flanked; he should have never been

8    detained in any way.

9          THE COURT:  Anything further that you wish

10   for the Court to consider?

11         MS. POLLOCK:  Nothing.

12         THE COURT:  Mr. Freres, on behalf of the

13   government.

14         MR. FRERES:  Thank you, Your Honor.  If it

15   pleases the Court.

16         First of all, the Court asked about the

17   subpoena.  The subpoena is actually part of Defense

18   Exhibit 2, but actually only requested -- it is very

19   clear on the subpoena it only requested the records

20   from Mr. Lewis, the LEADS checks on Mr. Lewis.  So I

21   don't think that's accurate.

22         I also take issue with a lot of the mixing

23   of what is in the reports and what is not in the

24   reports, and I think the Court is correct to only

25   consider what is in evidence here.

1          The situation here is not just a basic
2   reasonable suspicion analysis.  We are starting from
3   a point where there is an active search going on.
4   And this is the *Jennings* case.
5          Of course, the Supreme Court has long held
6   -- let me make sure that I get the proper language
7   here --
8          THE COURT:  I just want to back up here
9   because I want to just for the record resolve this
10  subpoena issue.
11         It reads:  A list of all warrant checks
12  performed on Mr. Lewis with his DOB by any VMEG
13  member or officer participating in his arrest on
14  that date, including, but not limited to -- and
15  names the officers.
16         And then in a new sentence it says:  A copy
17  of any LEADS requests sent in by those officers on
18  the date of his arrest.
19         Do you not think that that language would
20  include any LEADS requests by those officers?
21         MR. FRERES:  There was testimony, first of
22  all, that LEADS isn't the same as a local check, and
23  there is a lot of confusion on this.  And I would
24  read that to sort of be a continuation of the first
25  sentence.  I suppose it could be interpreted that

1  way certainly, but it is not clear.

2          Either way, I do know the agents did testify

3  that they checked and there weren't any records

4  though.  One of the agents -- I forget if it was

5  Benschneider or Bowmen -- they actually called to

6  check to see if there were warrants and there was

7  none.  I believe it was Agent Bowman said if there

8  were warrants when they were doing these local

9  checks, they wouldn't show up on the records.  These

10  weren't full blown LEADS checks.  They were calling

11  the locals, is effectively what they said they were

12  doing.

13          THE COURT:  Go ahead.

14          MR. FRERES:  Okay.  Your Honor, the starting

15  point from this is not just the basic reasonable

16  suspicion analysis.  We are starting from a

17  situation where there was already a search in place.

18  As the agents arrive, they are setting up a

19  perimeter and drugs had already been found and the

20  gun had already been found.  That is all within the

21  knowledge.  Of course, it could also be imputed the

22  knowledge of the DEA agents or the collective

23  knowledge doctrine.

24          The Supreme Court has long held that

25  officers executing a search warrant have, quote,

1  categorical authority to detain any occupant of the
2  subject premises during the search.  That's actually
3  recognized by the Seventh Circuit in the *Jennings*
4  case from 2008.
5          In the *Jennings* case, the Seventh Circuit --
6  going back, they were citing the *Summers* case, which
7  I cited in my brief, where the Supreme Court noted
8  that searches for drugs are the kind of transactions
9  that give rise to sudden violence or frantic efforts
10 to conceal or destroy evidence.  The risk of harm to
11 both the police and the occupants is minimized if
12 the officer's routine exercised unquestioned command
13 of the situation.
14         Then in the *Summers* case, the Seventh
15 Circuit analyzed, I believe, cases from the Ninth,
16 Sixth, and Third Circuits and they extended that
17 holding.  Originally *Summers* just dealt with the
18 occupants of a residence.  They extended that to new
19 arrivals.  And the reason for that is because the
20 logic is exactly the same.  New people who arrive
21 jeopardize the officer's safety; they can embolden
22 the folks on scene; they can introduce evidence
23 where it wasn't before; they can take evidence that
24 wasn't there before.  It's a problem on all fronts,
25 not only as a safety issue, but also the integrity

1  of the search that is going on.

2        For those reasons, we don't even get to the

3  reasonable suspicion analysis.  The officers could

4  stop Mr. Lewis as he is walking into the residence

5  on this occasion.

6        THE COURT:  But isn't there a difference

7  between preventing the entrance of a person who

8  arrives on the scene and even possibly detaining

9  them from searching them?

10        MR. FRERES:  Yeah, but I don't think they

11  did search him here.  They detained him to ask him

12  questions.  And it is commonplace in a detention for

13  them to be able to ask for ID, to run checks, to

14  observe his demeanor; and that's why during the

15  course of this he is continually putting his hands

16  in his pockets.  He is not being cooperative.  And

17  then we have Seventh Circuit case law on that, too,

18  which I also cited on page 11 of my brief, *United*

19  *States v. Koerth* -- excuse me.  That's the wrong

20  case.

21        *Oglesby* on page 12, where an encounter in a

22  high crime area, nervous and evasive behavior by the

23  detainee, and detainee reaching toward pocket

24  multiple times justified a frisk for weapons.  That

25  is effectively what we have here.  The officers

1 already knew that a kilo of coke and a gun was
2 discovered inside, and here somebody is showing up.
3 They can stop this person and they can run the
4 checks, in the course of doing so; that's exactly
5 what happened.
6        So when you go step by step, this is
7 supported by Seventh Circuit case law under any
8 number -- under any number of prongs where we don't
9 even get to the reasonable suspicion analysis.  That
10 said, I do think that as the two officers are
11 standing there outside of a residence where the
12 testimony is that they all had experience -- people
13 come and go from drug houses -- as they are standing
14 there, they knew that a distribution amount of
15 cocaine had just been found inside; there wasn't a
16 big presence of people; somebody is walking up to
17 that house; I think that's a basis to stop that
18 person, to question them about what is going on.
19        Of course, in the course of running the
20 checks, of course the defendant is resisting
21 commands, and at that point they have the concerns
22 about safety and they can pat him down.  They didn't
23 even get to the pat down.  He tells them he has a
24 gun.  None of the searches occurred.  He wasn't --
25 had weapons drawn on him until he said he had a gun.

1          Under all of those circumstances, I think
2   that the stop is just fine.  That's the four cases
3   that I cited:  *Jennings*, *Bohannon*, and the others,
4   about an individual arriving at the scene of a
5   search.  And, you know, inside -- Mr. Liggins is
6   still inside too, which the officers had already
7   arrested.  That's also -- that's the *Howard* case I
8   cited there, stating that the officers were
9   justified in detaining an officer who merged from
10  the same van as a suspect; the officers had probable
11  cause to arrest for a gun crime.  Effectively, the
12  same thing as here as well --
13          THE COURT:  Isn't that pretty factually
14  distinguishable though?  This isn't like Mr. Lewis
15  showed up and came out of the same car that was
16  previously occupied by Mr. Liggins or something like
17  that.
18          MR. FRERES:  It's not, but again the
19  testimony, again, using just what's in evidence, is
20  that people could come and go from drug houses.  It
21  is sort of similar in a sense that if you got
22  probable cause to arrest someone and someone is
23  showing up, just sort of willy-nilly on this stuff,
24  the experience of these officers as they stood there
25  is going to be, yeah, people are coming and going

1 from a drug house.  The DEA agents knew the drugs

2 were being stored for somebody was the testimony,

3 which means that it wasn't for Terrance Liggins to

4 just sit there; it was for somebody to come and get.

5         So all of those things are proper

6 considerations and I think the gun and -- excuse me

7 -- the drugs and the money all seized from his

8 person were seized lawfully.

9         THE COURT:  Thank you.

10        Anything further?

11        MS. POLLOCK:  Looking at a reasonable

12 officer in these circumstances, this term "drug

13 house" is very misleading because they knew who had

14 dropped those drugs off, and they knew where he was.

15 They had a GPS tracker on his vehicle.  Information

16 was from the task force officer: he is driving down

17 to Danville multiple times, stopping there.  They

18 knew he was a heavy trafficker.  Nobody knew who

19 David Lewis was.  And nobody thought Terrance

20 Liggins was selling.  Their information that they

21 have at the time, which can be imputed to all of

22 them, is that Terrance Liggins had just received a

23 kilo about an hour before and it was sitting in his

24 basement waiting for something else, not David

25 Lewis, who they never even heard of.

1         THE COURT:  They don't need to hear of him
2    in order for him to be a customer, correct?
3         MS. POLLOCK:  But Terrance Liggins wasn't
4    selling.
5         THE COURT:  How do we know that?
6         MS. POLLOCK:  Because he told them that.
7    That was their information.  Terrance Liggins told
8    them he was storing it for somebody.  It was broken
9    into two pieces, half a kilo each, not distribution
10   packages.  We know that it; ended up in the report,
11   which is wrong, that it was broken into four, but in
12   fact it was not.
13        So reasonable officers under those
14   circumstances, when everyone has been completely
15   cooperative, where Terrance Liggins is leading them
16   to the cocaine and sitting calmly on the couch
17   waiting to go give a two-hour statement at the
18   police station -- and don't you think that if they
19   had a suspicion about somebody walking up, they
20   would be like, Hey, Liggins, is somebody like coming
21   to buy this stuff from you right now?  Nobody asked
22   anything about David Lewis.  Nobody thought really
23   that he was coming to buy drugs.  What they saw was
24   an opportunity to search someone and that's what
25   happened.

So all of the knowledge together in a totally calm, non-antagonistic search where security is accomplished, the search is done.  You heard what the TFO said.  They were standing around trying to figure out who was going to take what and who was going to do what with who, but everybody was secured in the house.  There was no risk here.  There is no safety risk.  This is not like *Jennings* where a guy drives into the perimeter before the search is started and has crack in plain view on his seat. This is not that case.  They are all distinguishable in terms of the timing that the person arrived and the person's relationship to the premises being searched.  He is not an occupant of that house.  He has no relationship that anyone knows of with that house.  He didn't come out of the car as the person is being patted down.  There is no relationship. There is absolutely no independent basis whatsoever other than him walking up to the sidewalk that he has anything to do with this property, and yet they flanked him and they started the process.  That is am unlawful detention and it is not justified by this dreaded-drug-house-danger analysis that is misleading.  Nobody was in danger.  Everybody's weapons were holstered.  They are chilling out

1  inside the front porch.  They were not afraid.  They
2  were not nervous about that.  Their safety was not
3  an issue.  They had already sent people away.  And
4  if their safety -- they are saying that they are
5  still afraid of the peoples who had driven off that
6  were clear that pulled into the driveway at the same
7  time, why is David Lewis any different than that?
8  They didn't wait to see bulges or lie about cash
9  before they flanked him and were going to do it
10 anyway.  That's the facts of the case and that's
11 illegal.  And the Fourth Amendment requires his
12 suppression of that evidence and his statement.
13       THE COURT:  Okay.  Thank you.  I typically
14 rule from the bench, but I want to review some of
15 the testimony in this case.  I do think that it's a
16 close call, and I need to make specific factual
17 findings, and so I'm going to take it under
18 advisement.
19       I will -- the parties will be contacted and
20 I will probably rule over the phone with both of you
21 present just so I can do it in a more timely
22 fashion.  I expect that it will happen in a couple
23 weeks.
24       Okay.  Anything further on behalf of the
25 government?

1          MR. FRERES:  No, Your Honor.

2          THE COURT:  Thank you, Mr. Freres.

3          Anything on behalf of Mr. Lewis?

4          MS. POLLOCK:  I believe that we have a

5     pretrial date scheduled.

6          THE COURT:  Are we on the 9th?

7          MS. POLLOCK:  I'm not sure.

8          THE COURT:  It might be the April 9th date.

9     Could you check?

10         MS. POLLOCK:  I believe it was on

11    March 22nd.

12         THE COURT:  Oh, you have it before Judge

13    Long?

14         MS. POLLOCK:  Apparently so.  Can we

15    continue it to the next date, Your Honor?

16         THE COURT:  Yes.  So why don't we go ahead

17    and schedule it before me on the April 9th date in

18    Urbana, and if I have not contacted the parties to

19    rule by then, I certainly will rule on that date.

20         Let me look at my calendar.

21         So we could set it for -- why don't we set

22    it for 9:15.  Does that date and time work for the

23    government on April 9th in Urbana?

24         MR. FRERES:  I think so, Your Honor.

25         MS. POLLOCK:  That sounds right, Your Honor.

1          THE COURT:  Okay.  And are you okay with
2    that delay in the pretrial conference?
3          MS. POLLOCK:  Yes, Your Honor.
4          THE COURT:  Do we have a current trial
5    setting?
6          THE CLERK:  That is the current trial
7    setting.
8          THE COURT:  Oh, that is the current trial
9    setting.  Because I need time to rule on this
10   motion, do you object to continuing the trial date?
11         MS. POLLOCK:  No, Your Honor.
12         THE COURT:  Okay.  Mr. Lewis, are you in
13   agreement with that?
14         THE DEFENDANT:  Yes, ma'am.
15         THE COURT:  Okay.  So we can set a new trial
16   date for the week of May 20th.  Would that work?
17         MS. POLLOCK:  Yes, Your Honor.
18         MR. FRERES:  Yes, Your Honor.
19         THE COURT:  Okay.  So the Court finds that
20   additional time is needed for the Court to -- having
21   now heard the evidentiary hearing and oral argument
22   on the defendant's motion, for me to rule upon that
23   motion and for the parties to be able to have
24   sufficient time to prepare for trial with the
25   benefit of that motion or other disposition, the

1  time between today and the new jury trial setting of

2  May 20th shall be excluded pursuant to the Speedy

3  Trial Act.

4          Any objection to those findings?

5          MR. FRERES:  No, Your Honor.

6          MS. POLLOCK:  No, Your Honor.

7          THE COURT:  Anything further, Mr. Freres?

8          MR. FRERES:  No, Your Honor.

9          THE COURT:  Miss Pollock?

10         MS. POLLOCK:  No, Your Honor.

11         THE COURT:  We will be adjourned.

12         (Which were all of the proceedings held on

13         this day.)

14                              ****

15

16     I certify that the foregoing is a correct

17  transcript from the record of proceedings in the

18  above-entitled matter.

19

20

21  s/Nancy Mersot            Date: April 11, 2019
    Court Reporter

22

23

24

25